## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 10-20191-CIV-HOEVELER

**MARIA JOSE PEREZ, Individually and as
Personal Representative of the Estate
of FRANCISCO PEREZ, deceased,**

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

_____/

### <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

THIS CAUSE was tried before the undersigned without a jury on June 27-30, and July 1, 7, 8, 11-13, 2011. This is a wrongful death case brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., and 28 U.S.C. § 1346(b)(1). Maria Jose Perez filed this action against the United States after the death of her father, Francisco Perez ("Perez"), while he was receiving psychiatric and medical care from the Veterans Administration ("VA"). Plaintiff alleges that the United States is directly and vicariously liable for the negligence of the VA health care providers, and claims damages of $1,505,701.20 ($1,500,000 for the loss of her father, plus funeral expenses). The United States asserts that the damages were not proximately caused by negligent acts of its employees.

1

The Court has reviewed the file in this case, including the more than 4,000 pages of documents and photographs submitted as evidence, and has heard and considered the testimony of the witnesses and the arguments of the parties during the ten days of trial, and hereby enters the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).  As an initial matter, the Court briefly states the controlling legal principles.

## Controlling law[1]

The United States is liable for the negligent conduct of its employees in the same manner and to the same extent as a private individual under like circumstances.  28 U.S.C. § 2674.  Florida law governs the question of liability, as the relevant events of this case occurred in Florida.

In Florida, a duty to act - failing which may trigger liability for negligence - is established "when the acts of a defendant in a particular case create a foreseeable zone of risk."  Pate v. Threlkel, 661 So. 2d 278, 280 (Fla. 1995).  It has long been recognized that physicians owe patients a duty to "'use the ordinary skills, means and methods that are recognized as necessary and which are customarily followed in the particular type of case according to the standard of those who are qualified by training and experience to perform similar services in the community or in a similar community.'" Sweet v. Sheehan, 932 So.2d 365, 368 (Fla. Dist. Ct. App. 2d 2006),

---

[1]These legal principles, which are generally undisputed by the parties, are also adopted implicitly in the Court's "conclusions of law," *infra*.

quoting Brooks v. Serrano, 209 So. 2d 279, 280 (Fla. Dist. Ct. App. 4th 1968).  The

testimony of witnesses qualified as medical experts assists the Court in discerning

the relevant standard of care and whether it was breached, Pate, 661 So. 2d at 281,

guided by Fla. Stat. § 766.102(1): "the prevailing professional standard of care for a

given health care provider shall be that level of care, skill, and treatment which, in

light of all relevant surrounding circumstances, is recognized as acceptable and

appropriate by reasonably prudent similar health care providers."  A breach of the

standard of care must be proven by the greater weight of the evidence.  Fla. Stat. §

766.102(1).

A plaintiff alleging medical negligence must not only produce evidence that

the defendant breached the prevailing standard of care, but also must demonstrate

that the damages were "proximately caused" by that breach.  Fla. Stat. § 766.102

(3)(b); see also, Turner ex rel. Turner v. United States, 514 F. 3d 1194, 1203 (11th

Cir. 2008), citing Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d. 1015, 1018 (Fla.

1984).  Medical negligence must be established to have been "more likely than not"

or "probably" the cause of the injury.  Cox v. St. Joseph's Hospital, 71 So. 3d 795,

799 (Fla. 2011).  In the context of psychiatric care, it has been observed that "the

relevant inquiry is not whether [the psychiatrist] had a duty, but whether [he]

breached that duty by failing to treat [the patient] in accordance with the standard

of care required of him, and if so, whether this failure resulted in [the patient's]

injuries."  Sweet, 932 So. 2d at 368.

The Court now turns to the evidence in this case.

3

## FINDINGS OF FACT

In early 2006, Perez, a fifty-three year old veteran, began experiencing paranoid delusions that a religious cult (assisted by local law enforcement and his neighbors) was monitoring him and attempting to kill him and his wife and daughter. On February 13, 2006, Perez went to the VA medical center in Miami, Florida, and informed his primary care physician that he was suffering from extreme anxiety and "paranoia,"[2] and he needed an urgent evaluation by a psychiatrist. Joint Pre-Trial Stipulation, Uncontested Facts ("Stip."), ¶¶ 8-12. The physician, Dr. Gio Baracco,[3] immediately requested an urgent, i.e., within 24 hours, consultation for Perez with the VA mental health department. Dr. Baracco's urgent request - sent to Billie Haber of the Oakland Park Outpatient Clinic of the VA - was received approximately one hour later. The VA scheduled the requested appointment within minutes of receiving Dr. Baracco's request; the appointment was set for February 22, <u>nine days later</u>, with Dr. Gregory Manov. MR 306.[4]

_____

[2]The Court's citations to record excerpts include doctors' reporting of Perez's statements; for clarity, and unless otherwise noted, quotation marks will be used only when referring to specific words reportedly used by Perez.

[3]Dr. Baracco had been treating Perez for various medical issues for at least a few months, and the VA had been Perez's source of medical care for at least the past twenty years. <u>See</u>, <u>e.g.</u>, Plaintiff's Ex. 5 - Perez2RFP000015 (records of treatment in 1980s).

[4]This consultation request report, dated Feb. 13, 2006, appears in at least three different locations in the parties' exhibits: Plaintiff's Ex. 87, Plaintiff's Ex. 2 US 00306, and Defendant's Ex. 1 PerezSupp 0306. The parties referenced identical documents with varying identifying labels, e.g., Plaintiff's Ex. 2 includes 1230 pages of medical records labeled US 00001 - 01230, which are identical to the Defendant's

## First hospitalization for inpatient psychiatric care

Three days after seeing Dr. Baracco, and still six days before the psychiatric appointment scheduled by the VA, Perez and his wife went to the Emergency Department of the VA Hospital in Miami.  Perez arrived at the Emergency Department stating that he was "paranoid" and needed to see a "'cucu' doctor." Perez also complained of feeling depressed. MR 1172.  Perez told the VA medical staff that he had discovered something about the Catholic church and, because of this discovery, he and his family were in danger.  According to Perez, the church ordered his car and home to be bugged by the local police because he knew what was going on by the priests and schoolteachers.  He also claimed that the Catholic school which his daughter attended was involved in the conspiracy.  "They're trying to kill me and my family."  Stip. ¶¶ 16-19, MR 1168.

Perez was admitted to the hospital that day (February 16) for inpatient psychiatric care and was closely monitored, with a person (referred to as a "1:1 sitter") assigned to watch him continuously for suicide risk.  Stip. ¶¶ 12-14, 26, MR 1147-1154.  While Perez was hospitalized, several VA physicians noted the extent of Perez's delusions about the Catholic church.  Perez reported that he would give up his life before "they" take his family's life (recorded by Lourdes Mendoza, MD), and also said that there were demons all around him and "there's a strong chance that

---

Ex. 1 labeled PerezSupp 0001-1230; for clarity, the Court has cited to all of these medical records (MR) with only a page number, e.g., MR 306, that corresponds to both Plaintiff's Ex. 2 and Defendant's Ex. 1 - unless otherwise stated.

he will be killed"(noted by Heather A. Zacur, MD).  Stip. ¶¶ 21, 23, MR 1148, 1166.

Perez reportedly did not want to discuss the situation that brought him to the

hospital because "if I talk my family is in danger" (recorded by Lina T. Ramos, MD),

and he believed that he would be dead within the next few weeks, "killed by

someone or self to prevent harm to family" (noted by Salim I. Dib, MD).  Stip. ¶¶ 24,

25, MR 1142, MR 1158.  Perez also exhibited "hopeless behavior," with a restricted

to blunted affect, and limited insight or judgment; for example, Perez reportedly

denied that he felt hopeless, but stated: "I don't want to be here they are going to

kill me anyway" (recorded by Richard Douyon, MD).  MR 1125-1126.

 The VA records reveal that, in addition to his psychiatric care needs, Perez

also had several ongoing medical issues for which he had been receiving care from

the VA for many years.[5]  For example, Perez had been diagnosed in 1989 as HIV-

positive, Trial Testimony of Sandra Perez ("Tr. (S. Perez)"), June 27, p. 104,[6] and in

the months prior to the start of his delusions, Perez reportedly was not compliant

with his prescribed HIV-related medications.[7]

---

[5]Perez, who suffered from emphysema and chronic obstructive pulmonary disease (COPD), told the VA staff that he smoked at least a pack of cigarettes daily. MR 1168.  See also, MR523 (noting emphysema in xrays taken in 1999).

[6]An expert witness testifying for the Defendant noted that the HIV infection may have been the result of a blood transfusion Perez received while being treated for an injury he suffered as a construction worker. Tr. (Hughes) July 8, p. 55.

[7]For example, on December 6, 2005, Dr. Baracco had noted that Perez had "asymptomatic HIV/AIDS ... [and was] non-adherent to meds." MR 1175.  Dr. Baracco noted that Perez agreed to start taking his medications again after several weeks' "holiday" and that Dr. Baracco would reassess in 3 months. Id.

During this hospitalization, Perez was diagnosed by the VA with depression, psychosis, paranoid delusions, and suicidal thoughts. Stip. ¶ 13; MR 1126, 1166, 1168. The VA's records from this hospital admission also noted Perez's history of "paranoid schyzophrenia [sic]." MR 1154-57. Perez's delusions were noted as likely related to HIV/AIDS or alcohol abuse, with the symptoms likely related to an underlying organic cause. MR 1151-1152. It was noted that Perez had a history of alcohol abuse and had been drinking twelve beers daily but recently reduced the quantity he was consuming because he wanted to be alert when "they come for him." MR 1166. At the time of his discharge on February 19, 2006, hospital staff observed that Perez's delusions were "less paranoid." MR 1116.

When he was discharged, Perez was given a prescription for 100 mg of Seroquel (also known as Quetiapine), an antipsychotic medication,[8] to be taken "at bedtime for nerves." Plaintiff's Ex. 66: USA-70, MR 1117-1118.[9] Perez was advised to be compliant with his medications, and to attend the appointment which had been scheduled previously with Dr. Manov; he also was told to report to the hospital

---

[8]The Court adopts the descriptions of the various medications as testified to - without objection - by Plaintiff's expert witness, Dr. Jerald H. Ratner. Tr. (Ratner) June 29, pp. 20-21. The witnesses referred to some medications by their brand name but not others; the Court has capitalized the name of all medications referenced in this order, without regard to whether the name of the medication is a brand name, e.g., Wellbutrin (brand name for bupropion), and has adopted the witnesses' choice of name for the medication.

[9]The prescription for 100 mg of Seroquel was filled on the same date it was issued by the hospital-based physician, and had only one refill available. Plaintiff's Ex. 66: USA-70.

if he had any suicidal thoughts.  MR 1115-1118.

## First appointment with Dr. Manov

On February 22, 2006, three days after Perez was discharged from inpatient care, Perez had his first appointment, as previously scheduled, with Dr. Manov, a staff psychiatrist working at the VA's Oakland Park Outpatient Clinic in Broward County, Florida.  MR 1108-1110.  The record of this appointment prepared by Dr. Manov, found in the "Progress Notes" in the VA medical records, indicates that he saw Perez for fifty minutes for medication[10] management and psychotherapy in treatment of his "delusional disorder."  MR 1108.

Sandra Perez attended this appointment with her husband, and testified at trial that they were "rushed in and rushed out" and Dr. Manov "didn't seem very interested in what [Perez] had to say."  Tr. (S. Perez) June 27, pp. 111-112.  The parties have stipulated that at this appointment Dr. Manov did not review Perez's entire medical record from his recent VA hospital admission for inpatient psychiatric care.  Stip. ¶ 28. At trial, Dr. Manov acknowledged that he could have reviewed Perez's record on the VA computer system, as a patient's medical and medication history "pops up" at his computer automatically after Dr. Manov

---

[10]At trial, the term "psychotropic medications" was used to refer to the medications prescribed to treat Perez's mental illness; for brevity's sake, this Order refers simply to "medications" to indicate the collective assortment of antipsychotic, anti-anxiety and antidepressant medications prescribed to Perez at different times by the VA.

requests the information.  Tr. (Manov) June 29, pp. 40-41.[11]

At this appointment, Dr. Manov concluded that Perez suffered from an elaborate delusional system; his delusions included, in Dr. Manov's words: a "satanic sect in the roman catholic church, the teacher in his daughter's school is a girl he new [sic] 25 years ago, he is followed in unmarked cars by the police, etc." MR 1101.  Dr. Manov noted that Perez "does not have any plans of hurting anybody, including himself, but very concerned they are after him." Id.  At trial, Dr. Manov testified that he diagnosed Perez with a delusional disorder instead of a schizoaffective disorder because Perez did not meet all the criteria of schizophrenia, as he "didn't hear voices, [have] hallucinations [and] his affect was not blunted." Tr. (Manov) June 29, p. 67. Although Dr. Manov diagnosed Perez with a delusional disorder, there is no indication that Dr. Manov made any diagnosis related to the onset of Perez's delusions at the age of fifty-three without a prior history of mental illness.

After Perez had described his (delusional) concerns, Dr. Manov recommended that Perez view the film "Conspiracy Theory."[12]  Tr. (S. Perez) June 27, p. 112; Tr.

---

[11]Another witness for the VA testified that the VA has two computerized record systems: a computerized patient record system ("CPRS"), and another system (known as the "VISTA" system) which lists a patient's entire prescription history. Tr. (Scheer) June 28, pp.l 50, 53. Dr. Manov testified that the two programs automatically connect to each other.  Tr. (Manov) June 29, pp. 40-41.

[12]"Conspiracy Theory" is a film about a "man obsessed with conspiracy theories [who] becomes a target after one of his theories turns out to be true." www.imdb.com, last visited July 13, 2012.

(Manov) June 28, p. 173, June 29, p. 75.  Dr. Manov testified that it was therapeutic on his part to recommend that Perez watch the movie, in order to see how people develop a delusional system, although Dr. Manov testified that he himself "[didn't] remember the movie [but knew that] the movie is called Conspiracy Theory, and that's what the patient had, another conspiracy theory."  Tr. (Manov) June 29, pp. 76, 133.

As noted above, during Perez's recent hospitalization he had been prescribed 100 mg of Seroquel, an antipsychotic medication.[13]  Although Perez was a new patient of Dr. Manov, and Perez had only received his first prescription of Seroquel one week before his first appointment with Dr. Manov, the Progress Notes record that Dr. Manov "renewed" Perez's medications.  MR 1108.  The VA's "Medication Profile" as to Perez (a report which records the status of all prescriptions issued to Perez) reveals, however, that although Dr. Manov stated that he had "renewed" Perez's medications, he did not renew the prescription for 100 mg of Seroquel which had been issued the week before, on February 19, 2006, by a VA hospital-based physician, and which had one refill remaining, but instead Dr. Manov issued a new prescription for 25 mg of Seroquel to be taken three times daily.  MR 1108-1109.[14]

In essence, Dr. Manov adopted the decision of the VA hospital-based

---

[13]Dr. Manov testified that "any antipsychotic" would have been fine.  Tr. (Manov) June 28, p. 177, June 29, pp. 49, 72, 89.

[14]The prescription for 25 mg of Seroquel was issued on February 22, and filled one time, on that same date.  Plaintiff's Ex. 66: USA-70.

physician whom had initially prescribed Seroquel to Perez, and then in addition to the existing prescription for 100 mg of Seroquel daily, Dr. Manov prescribed another dosage of 25 mg of Seroquel to be taken three times daily. Thus, when he left the VA on February 22 after this appointment with Dr. Manov, Perez had an active prescription for a total daily dosage of 175 mgs of Seroquel (25 mg three times daily plus 100 mg at bedtime), i.e., nearly double the amount of Seroquel which had been prescribed to him for the first time just the prior week.[10]

Dr. Manov noted in the record that Perez was to return in one month; however, a follow-up appointment was scheduled for March 7, 2006, just two weeks later. The VA canceled that appointment, Stip. ¶ 33, and the record does not reeal that the VA rescheduled the appointment, nor made any attempt to do so, for at least several weeks. Plaintiff's Ex. 6. On March 7, 2006, instead of seeing Dr. Manov (since the VA had canceled that appointment), Perez attended a scheduled appointment with his VA primary care physician, who noted that Perez still had a very elaborated paranoid delusion. MR 1105. Perez then failed to attend his VA appointments on March 29 for a stress test and on April 5 with the radiology department. Plaintiff's Ex. 6.

## Second hospitalization for inpatient psychiatric care

On April 7, 2006, approximately six weeks after seeing Dr. Manov and less

---

[10]At this appointment, Perez only received the 25 mg dosage of Seroquel, and did not receive a refill of the 100 mg dosage. Plaintiff's Ex. 66: USA-70.

than two months after being discharged from inpatient psychiatric care, Perez was

again hospitalized for psychiatric care.  Perez had called his wife at work that day

to tell her goodbye because, as he told her, that was the day that he would be killed.

Tr. (S. Perez) June 27, p. 113.  She then called the police, and officers from the

Police Department of the City of Davie, Florida, took Perez to Memorial Regional

Hospital in Hollywood, Florida, where he was involuntarily committed pursuant to

Fla. Stat. § 394.467 (the "Baker Act") for psychiatric care in a "lock-down" unit.

Stip. ¶ 34.  At the time of this admission, Perez believed that his home was being

monitored by listening devices and that the neighborhood cops were out to get him.

Plaintiff's Ex. 1, MHW18, 89.  According to the law enforcement report which

initiated the involuntary hospitalization, Perez refused to be admitted voluntarily,

and there was a substantial likelihood that without care or treatment he would

cause serious bodily harm to himself or others.  Perez reportedly said that he would

be kidnapped by the cult and was going to die, and admitted that he had been

drinking.  Plaintiff's Ex. 1, MHW 119.

     Upon admission, Perez was diagnosed by David Flaherty, DO, as having a

schizoaffective disorder and being alcohol dependent, Plaintiff's Ex. 1, MHW 20,[11]

and during this hospitalization Perez was diagnosed with a major depression

disorder.  Plaintiff's Ex. 1 MHW 13-14, 19-21.  When Perez was discharged from

---

[11]According to the discharge summary as to this hospitalization, Perez was
admitted for paranoia and persecutory thoughts and hallucinations. Plaintiff's Ex.
1, MHW 19.

Memorial Regional Hospital on April 11, 2006, he was considered to have a schizoaffective illness with psychosis and alcohol dependence.  Perez was sent home with a prescription for 10 mg daily of Abilify (also known as Aripiprazole), an atypical antidepressant used as an antipsychotic, and 150 mg daily of Wellbutrin XL (also known as Buproprion), an antidepressant; the hospital records state that medication management was to be continued with Dr. Manov at the VA.  Plaintiff's Ex. 1, MWH 19-21.

### Second and third appointments with Dr. Manov

On April 13, 2006, Dr. Manov saw Perez for a second appointment, scheduled at the request of Memorial Hospital upon his discharge two days earlier.  At this appointment, Dr. Manov did not review Perez's entire medical records from the two recent hospital admissions for psychiatric care.  Stip. ¶ 36.  According to Dr. Manov's brief notes of this appointment - which are strikingly similar to the notes he recorded in February, he spent 25 minutes with Perez.  MR 1102.[12]  The record of this appointment on April 13 includes the same typographical errors found in the February report, e.g., that Perez drank "twio beers last night," and only adds a few words at the beginning of the report: Perez had been "Baker acted ... on abilify and wellbutrin, doing somewhat better."  MR 1102.  Sandra Perez also attended this

---

[12]The report also incorrectly states that this appointment was "50 min for medication management and psychotherapy"(apparently a copied entry from the record of the initial appointment on February 22) but elsewhere reflects that this second appointment was for only 25 minutes.

appointment with her husband and testified that it was "very much like the first [appointment with Dr. Manov], ten or 15 minutes in length," that Dr. Manov did not appreciate what Perez was experiencing, and Dr. Manov's treatment was "horrible." Tr. (S. Perez) June 27, pp. 114, 160.

As he had done at Perez's first appointment, Dr. Manov again adopted the medication choices of the hospital-based physicians whom had recently treated Perez. Dr. Manov issued new prescriptions for Abilify and Wellbutrin XL, and, although Perez had only received his first prescriptions of these medications several days earlier, Dr. Manov decided to double the dosage of Abilify which had been prescribed at the hospital (from 10 mg daily, to 10 mg twice daily).[13] There is no indication in the record as to the reason for this increase. Dr. Manov prescribed Wellbutrin XL at the same level that had been prescribed at the hospital the prior week,[14] and also stated that he was renewing Perez's other medications. MR 1102.[15] The record reveals, however, that Dr. Manov only renewed the prescription for 25 mg of Seroquel (three times daily) that he had prescribed the prior month (which

---

[13]The prescription for 10 mg of Abilify twice daily was issued and filled on April 13, and refilled once, on May 3, 2006. Plaintiff's Ex. 66: USA-45.

[14]The prescription for 150 mg of Wellbutrin XL (bupropion HCL) daily was issued and filled on April 13, 2006, and refilled once, on May 3, 2006. Plaintiff's Ex. 66: USA-51.

[15]Dr. Manov also - without comment - renewed a prescription for an erectile-dysfunction medication, Levitra (also known as Vardenafil), MR 1102-1103, which had been initially prescribed on March 7 by Dr. Baracco, upon Perez's request. MR 1105.

14

did not need to be renewed because refills remained),[16] and did not renew the prescription for 100 mg of Seroquel (at bedtime).[17]  There is no statement in the record explaining this decision.

Perez apparently elected to refill the previous - and still active - prescription for 100 mg of Seroquel, and also filled the new prescription for 25 mg of Seroquel; therefore, Perez left the VA Clinic that day with a total of 175 mg of Seroquel - nearly double the amount he had been prescribed just one month earlier. As of this appointment, Perez had active prescriptions for an antidepressant (Wellbutrin XL), and two different antipsychotic medications (Seroquel and Abilify).

Again, despite a note by Dr. Manov that Perez should return in one month, an appointment was scheduled for Perez to see Dr. Manov two weeks later, on April 28, 2006.  Perez cancelled that appointment and scheduled an appointment for May 12, 2006, i.e., Perez scheduled an appointment for one month after the April 13 appointment.

At this next 25 minute appointment with Dr. Manov (Perez's third appointment with Dr. Manov), Dr. Manov again recorded that Perez was "very

---

[16]The original prescription for 25 mg of Seroquel had been filled only one time, on February 22, and had five refills remaining when it was replaced by Dr. Manov when he issued an identical prescription the following month.  The new prescription was filled on April 13, and on May 3, June 2, September 6, and December 27, 2006; the final refill was received on January 16, 2007.  Plaintiff's Ex. 66: USA-70.

[17]The prescription for 100 mg of Seroquel was filled on the same date it was issued by the hospital-based physician, and the only available refill was distributed to Perez on the day of this April 13 appointment.  Plaintiff's Ex. 66: USA-70.

concerned that they are after him" and that he didn't want to return to Miami. Stip. ¶ 41. The majority of Dr. Manov's recorded observations of this May 12 appointment are identical to his notes of the two prior appointments with Perez, e.g., he again reports that Perez is on Abilify and Wellbutrin XL and "doing somewhat better." MR1099-1100. He records that Perez has a clear elaborate coherent delusional system and adds a new observation: Perez's "plan is to stay with the object of his erotomanic delusion after the divorce and selling the house."[18] MR 1100. Despite Perez's ongoing delusions, the Progress Notes relating to this appointment note that the patient was "assessed to be competent at medication administration and can self administer medications." MR 1102.

Dr. Manov recorded that he renewed Perez's prescriptions[19] for Wellbutrin XL[20] and Abilify - but instead of renewing the prescribed dosage of 10 mg of Abilify

---

[18]Perez ultimately amicably divorced Sandra Perez the following year, in October 2007 - a result of his delusion that he was in love with a woman from his past whom he thought flew airplanes and helicopters over his house - and began living alone. MR 500-501, Tr. (S. Perez) June 27, pp. 119-120.

[19]The Court finds that the VA's Medication Profile is not always consistent with the medications listed in the Progress Notes as to certain dates. For example, the list of medications included in the Progress Notes as to Perez's appointment with Dr. Manov on May 12 indicate that both prescriptions for Seroquel (in the 25 mg and 100 mg dosages) are available, MR 1100-1101, although the VA's Medication Profile reveals that the last refill remaining as to the prescription for 100 mg of Seroquel had been filled on April 13, and no refills remained. Plaintiff's Ex. 66: USA-70.

[20]Although the original prescription for Wellbutrin XL 150 mg (once daily) had not yet expired and refills remained available, Dr. Manov renewed the prescription on May 12. The renewed prescription was filled only one time, on June 2, 2006. Plaintiff's Ex. 66: USA-51.

taken twice daily, Dr. Manov replaced[21] that prescription with a new prescription at an increased dosage: 30 mg taken twice daily.[22]  The total daily amount of Abilify which was prescribed to Perez at this time was <u>six times</u> the amount which had been prescribed to him during his hospitalization the prior month.  Dr. Manov noted that he had adjusted the medication upward at this appointment, MR 1099, although the record is silent as to why he did so.[23]  Perez left this appointment with active prescriptions for an antidepressant (Wellbutrin XL), and two different antipsychotic medications (Seroquel and Abilify, and the Abilify was at a newly increased dosage).

This was Perez's final appointment with Dr. Manov in 2006.  Although Dr. Manov's notes indicate - again, as at the prior two appointments - that Perez should return in one month, neither the VA nor Perez scheduled a follow-up appointment.  Stip. ¶¶ 42-43.  Indeed, Perez was not seen by Dr. Manov or any other psychiatrist or mental health professional at the VA for more than seven months after his May

---

[21]Nurse Heitman's notes of September 28, 2006, include a list of the inactive prescriptions.  MR 1090.

[22]This prescription for Abilify 30 mg (twice daily) was initially issued on May 12 and was filled once, on that same date.  Five refills remained available but not obtained, and the prescription expired on May 13, 2007.  Plaintiff's Ex. 66: USA-46.

[23]Dr. Manov testified at trial that his intention was to switch Perez from Seroquel to Abilify, as both are antipsychotic medications, Tr. (Manov) June 28, pp. 177-178, but he did not discontinue Seroquel at this time.  Dr. Manov's claimed intent to switch these prescriptions does not explain the significant increase in dosage of Abilify in May 2006 while Perez is still receiving Seroquel.

12, 2006, appointment with Dr. Manov.[24]  Stip. ¶ 44.  In essence, Perez was abandoned by the VA as to his psychiatric care and left to fend for himself despite his several relatively new prescriptions for psychotropic medications;[25] this abandonment occurred despite Perez's two recent admissions for inpatient psychiatric care (which included 1:1 care for suicide monitoring) as a result of diagnoses of: schizoaffective illness, psychosis, depression, paranoid delusions, suicidal thoughts, and alcohol dependence.

## Third hospitalization for inpatient psychiatric care

On the night of December 30, 2006, Perez and his wife again went to the Emergency Department of the VA Hospital in Miami, where he was admitted for psychiatric care.  Stip. ¶ 45, MR 1082-85.  The VA assessed Perez's condition at the time of this admission as: psychosis, psychosis secondary to HIV, psychosis secondary to substance abuse,[26] and delusional disorder.  MR 1081.  During this

---

[24]Perez was seen at the VA for his other medical needs during this time, at appointments on June 20, July 10, August 31, September 12, September 28, and October 8, 2006.  Perez did not visit the VA, however, for any medical care between October 8 and his arrival at the VA hospital on December 30, 2006, for urgent psychiatric care.

[25]Perez had been prescribed the twice daily dose of 30 mg of Abilify for the first time at this appointment (replacing the previously prescribed dose of Abilify (10 mg twice daily) which had been prescribed only one month earlier).  Perez had been prescribed Wellbutrin XL just one month earlier, and had been prescribed Seroquel (25 mg three times per day plus 100 mg at bedtime) three months earlier.

[26]Perez admitted that he had consumed three to four beers daily prior to this hospitalization.  MR 1064.

hospitalization, VA staff observed that Perez had "chronic and elaborate suicide ideations which appeared to be overly detailed;" as an example, it was documented that his "plans appeared to involve extensive planning and detailed execution (attaching a knife to steering wheel and crashing vehicle into oncoming traffic so as to obviate safety of airbags)." Stip. ¶ 55, MR 1025.   Soon after he was admitted to the hospital, Perez was given several medications to treat his anxiety and agitation, e.g., 15 mg of Olanzapine (also known as Zyprexa), 5 mg of Haldol, etc.  MR 1078-1081.

Perez explained that he had not been taking his prescribed medications regularly because he doubted their efficacy. MR 1025.[27] According to Perez, he had attempted to receive his prescribed 25 mg dosage of Seroquel but was given a "lower dosage" that was not working for him. MR 1079.[28] Perez stated that he was at the hospital only because "my wife thinks I am crazy." MR 1079.  VA staff recorded that Perez had a disorganized thought process with paranoid (religious, persecutory) content, and poor insight and judgment; staff also noted that Perez planned to divorce his wife (to whom he had been married for eighteen years)

---

[27]Perez also reported that he was not compliant with his HAART (HIV-related) medication regimen, e.g., due to his fear that he would build up a resistance if he continued to take the medications at the recommended levels (reported by John A. Davenport, MD).  MR 1040.

[28]Mrs. Perez reported to the VA staff that Perez had moved all of his VA-related correspondence to another mailing address, so she was unable to verify whether her husband was receiving his medications prescribed by the VA (and mailed to him).  MR 1064.

because he wanted to pursue another woman he believed he had been meant to be with, according to a prophecy written by his "god father" that he read a long time ago.[29]  Mrs. Perez testified at trial that Perez's delusion about this woman (whom apparently did not exist) compelled him to spray-paint giant hearts on the lawn of their backyard because he believed that the woman flew over the house and could see them from the air.  Tr. (S. Perez) June 27, pp. 119-120.

Similar to his earlier psychiatric hospitalization at the VA, several staff members noted the specific extent of Perez's persecutory delusions during this hospitalization.  Perez said that he was being followed by a cult[30] that he had only been aware of for the past three years (reported to Lester P. Hartswick, MD), MR 1063, and that the "cult is after me" and wants "to kill me"(noted by Helia Ibarra-Pereira, MD), Stip. ¶¶ 46, 47, MR 1079.  Perez was depressed and felt that things were coming to a conclusion when they would come for him and his family, Stip. ¶ 49, MR 1064, and that his family "was being set up to be killed" (noted by Astra M. Remy-Calixte, MSW), Stip. ¶ 50.  He expressed concern and said that he would "take [the cult] out before they harm my family" (as reported to Richard M. Dreize,

---

[29]Perez described that he started to have encounters with the woman in question "at age 4 but that he had forgotten, each time" and that he and the woman were destined to "change the world" (noted by social workers and Diana L. Santiago Vergara, MD).  Stip. ¶ 62, MR 983, 1061.

[30]Perez explained that the cult had "started in India near the Himalayas" (reported by Tessy S. Karakunnel, RN), Stip. ¶ 60, MR 1003, and that the cult had been around "since the beginning of mankind .... It's the God with 1000 Arms" (noted by Richard M. Dreize, MD).  MR 1005.

MD).  Stip. ¶ 57, MR 1005.  Mrs. Perez and her daughter (the Plaintiff) had been interviewed at the hospital[31] and reported that Perez had told them "I will kill you myself so that you don't suffer" (recorded by Helia Ibarra-Pereira, MD).  MR 1079.  Perez confirmed some of the details reported by his family, MR 1064, and said that he thought it would be best to kill his family to save them from the cult, but that he did not have the "guts" to do it (noted by Lester P. Hartswick, MD), Stip. ¶ 52, MR 1052.

Approximately one week after being admitted to the hospital, Moraima Trujillo, MD, noted that Perez was still psychotic but he did not have a current suicidal or homicidal intent or plan; he reportedly "ruminates about how he could do those things, but has no plans to carry them out." MR 1024.  Despite being given several psychotropic medications during the first week of this hospitalization, Perez continued to experience paranoid delusions, Stip. ¶ 58, MR 969-72, reporting that he felt safe at the hospital but vulnerable when he was at home, Stip. ¶ 53.  He continued to worry about his family and what the cult could do to them.  Stip. ¶¶ 56, 58.  After two weeks in the hospital, Perez was still worried about the cult, noting that he did not trust his neighbor (purportedly a member of the cult), and also that he was being "spied upon" by government agents.  Stip. ¶¶ 63, 65, MR 970, 983.  Despite Perez's repeated denial of any suicidal or homicidal ideations, VA

---

[31]Perez permitted the VA to speak with his wife and daughter during this hospitalization, and they reported that Perez had been very paranoid and withdrawn at home, and would not go out of his room all day.  MR 1079.

hospital-based psychiatrists continued to conclude, until January 16, that Perez required 24-hour nursing care in a secured, locked unit, and that he could not be safely treated in a less restrictive environment.  MR 952-954.[32]

According to the hospital records, on January 16, Perez had been prescribed two antipsychotic medications: 20 mg of Olanzapine (also known as Zyprexa) and two dosages of Risperidone (a 1 mg tablet, half of which to be taken twice daily, and a 25 mg long-acting injection to be taken every 2 weeks - the next injection was scheduled for January 30); an anti-anxiety medication: 1 mg of Clonazepam (also known as Klonopin), and an antidepressant: 150 mg of Wellbutrin XL (150 mg). MR 936-937.  Each of these was issued with only a single month's dosage, which was distributed before Perez's discharge, so there were no refills available when he left the hospital.  Shortly before Perez was to be discharged, Dr. Trujillo also issued to Perez a prescription for a 25 mg injection of a long-acting form of Risperidone, with three refills available, so that Perez "will not decompensate due to non-compliance with oral medications."  MR 954-955.  The VA's Medication Profile also reveals that, at the time he was discharged, Perez still had an active prescription for Abilify (30 mg dosage, taken twice daily) and Wellbutrin XL - both prescriptions had refills available.  Plaintiff's Ex. 66: USA-45-46.

---

[32]Although Perez continually denied any suicidal intent, the VA psychiatrists determined, upon his arrival at the hospital and again approximately every four days for a two week period, that Perez needed to remained in the locked unit.  See, e.g., notes of January 3, 7, 12, and 16, 2007.  MR 1028-1030, MR 999-1002, MR 969-971, MR 952-954.

When he was discharged on January 18, his diagnosis was depression and psychosis. The Final Discharge Note, dated January 18, states that "outpatient treatment will be arranged to continue to manage" Perez's condition, and an appointment was scheduled for February 6 with Dr. Manov. MR 931-936.

While Perez was hospitalized, the VA accepted Perez into its Mental Health Intensive Case Management ("MHICM") program and assigned a social worker, William Scheer, to be Perez's MHICM case manager upon his discharge from the hospital. Stip. ¶¶ 66-67. Mr. Scheer began visiting with Perez in the hospital on January 16, 2007, and drove Perez home two days later. MR 926, 947-948.

## Fourth and final appointment with Dr. Manov

At Perez's appointment on February 6, 2007 - his first appointment with Dr. Manov since May 12, 2006, and what would be his only appointment in 2007 - Dr. Manov noted that Perez was still delusional, had an inappropriate affect, little insight, and poor judgment. MR 914. Although Perez had just been released less than three weeks earlier from his third in-patient psychiatric admission in ten months, Dr. Manov saw Perez for only 25 minutes, then dismissed him with instructions to return for an appointment in six months.[33] Dr. Manov testified that he recommended that Perez did not need to be seen for six months because "[a]ccording to [Perez], everything was going okay" and a monthly appointment was

---

[33]Dr. Manov claimed that he only recommended a follow up in one month if the patient was a new patient. Tr. (Manov) June 28, p. 185.

not needed because it would not be "logical for me to see a man that everybody was satisfied with what he's doing." Tr. (Manov) June 28, pp. 185-187. At trial, Dr. Manov acknowledged that Perez's elaborate suicide plan discussed during his recent hospitalization - which Dr. Manov claimed he was not aware of - was certainly a "classic red flag of being suicidal" at that time. Tr. (Manov) June 28, p. 183.

At this final appointment, Dr. Manov noted the psychotropic medications currently prescribed to Perez: Risperidone, Olanzapine, Clonazepam, and Wellbutrin XL. MR 913. Dr. Manov again adopted the decisions of the hospital-based physicians regarding the medications to prescribed to Perez, and issued new prescriptions to Perez for Risperidone,[34] Olanzapine,[35] and Clonazepam,[36] in the

---

[34]The original prescription for the 25 mg long-acting injection of Risperidone was issued on January 16, and filled on that date. Plaintiff's Ex. 66: USA-70. Although the original prescription for the 25 mg injection had not expired and had three refills remaining, Dr. Manov replaced that prescription with a new prescription. The new prescription, which was filled only once, on the date it was issued, had eleven refills remaining when it expired on February 7, 2008. Plaintiff's Ex. 66: USA-71.

The original prescription for .5 mg of Risperidone twice daily had been issued as a single dose at the hospital and already had expired as of February 6. Dr. Manov renewed the prescription for .5 mg of Risperidone twice daily on February 6, and it was filled on that date, and refilled on May 14 and June 3; when it expired, three refills remained until the prescription expired on February 17, 2008. Plaintiff's Ex. 66: USA-70.

[35]The original prescription for Olanzapine was issued on January 16 as a single dose, and filled the next day. Dr. Manov renewed that prescription on February 6, 2007, and it was filled only on that date; when it expired on February 7, 2008, five refills remained. Plaintiff's Ex. 66: USA-69.

[36]The original prescription for Clonazepam was issued on January 16 as a single dose, and filled the next day. Dr. Manov renewed that prescription on February 6, 2007, and it was filled on that date and twice in March, once in May,

dosages prescribed at the hospital the prior month, and added these to Perez's existing medications. Dr. Manov renew the prescription for Wellbutrin XL,[37] but he did not renew the prescription for 30 mg of Abilify twice daily (Perez had not filled that prescription since the day it was prescribed, May 12, 2006). Dr. Manov also again reported that "patient is assessed to be competent at medication administration and can self administer medications" and noted that Perez was "[t]aking his meds with no side effects." MR 914-915.

At the conclusion of this appointment, Perez had active prescriptions for an antidepressant, a newly prescribed anti-anxiety medication (Clonazepam), and three antipsychotic medications (including a newly prescribed 20 mg of Olanzapine twice daily). Dr. Manov told Perez that he did not need to return for six months, even though Dr. Manov's notes indicate that he considered the efficacy of the prescribed medications to be only "fair." MR 913-915.[38] Ultimately, Dr. Manov did not see Perez for the next fourteen months. Perez again was left alone to manage his own psychiatric care despite having a diagnosis of delusional disorder with

---

and once in June 2007; when it expired on August 9, 2007, one refill remained. Plaintiff's Ex. 66: USA-52.

[37]The new prescription for 150 mg of Wellbutrin XL was issued on February 6, and filled on that date, and again on June 6, August 30, October 4, October 24, 2007; the final refill was received on January 4, 2008. Plaintiff's Ex. 66: USA-51.

[38]Dr. Manov apparently expected that someone other than himself would administer the prescribed injection of Risperidone, which was to be administered every two weeks, to Perez, given his recommendation that he not return for an appointment for six months.

paranoia and depression, and having been prescribed multiple psychotropic medications - including three medications that were recently added (Risperidone, Olanzapine, and Clonazepam).

## Mental Health Intensive Case Management ("MHICM") program

As noted above, Perez was admitted to the MHICM Program during his January 2007 hospitalization, and William Mr. Scheer was assigned as Perez's case manager. Stip. ¶ 66-68. Prior to providing care to Perez, Mr. Scheer did not review Perez's entire medical record from his three prior mental health hospitalizations, nor did Mr. Scheer review those records at any time while Perez was in the MHICM program. Stip. ¶ 70. Mr. Scheer did not know about Perez's suicidal ideations, his delusions about the Catholic church, or his belief that neighbors were spying on him, and Mr. Scheer also never spoke to Dr. Manov about Perez during the time that Perez was in the MHICM program. Tr. (Scheer) June 28, pp. 39-42. (Although the MHICM program had an assigned psychiatrist, there is no evidence that Perez's care was switched from Dr. Manov to a MHICM psychiatrist. Tr. (Scheer) June 28, pp. 42-43, 86, 137.) Mr. Scheer admitted at trial that there were several warning signs that he would have seen in the recorded notes of Perez's history, if he had reviewed those notes, including a prior suicide plan as a clear sign of risk, and other possible signs of risk including alcohol abuse, a chronic illness (HIV), and mental illness. Tr. (Scheer) June 28, pp. 135-137.

The VA's records reveal that Mr. Scheer visited Perez at his home a total of

26

approximately seventeen times, with the majority of visits occurring during the two months immediately after Perez was discharged from the hospital in January 2007. Plaintiff's Exs. 73, 77, 78, 79. Mr. Scheer testified at trial that he did not believe that Perez was abusing alcohol while he was being cared for in the MHICM program, and on only one visit to his home did Mr. Scheer witness Perez drinking a beer. Tr. (Scheer) June 28, p. 133. Mr. Scheer also testified, consistent with his recorded notes from January through April 2007, that Perez generally was compliant with his medications while in the MHICM program. Tr. (Scheer) June 28, pp. 25, 64. Mr. Scheer stated that he did not only rely on Perez's self-reporting that he was taking his medications, but would also review the VA's computerized medication records and if he noticed that the person was not obtaining their refills he would talk to them and encourage them to take their medications. Tr. (Scheer) June 28, pp. 54-55.[39] According to Mr. Scheer's notes of a discussion on February 14, 2007, Perez inquired about receiving a long-acting injection of antipsychotic medication, as an alternative to his other medications; Mr. Scheer also noted, on other occasions, that Sandra Perez had inquired about such an injection being administered to her husband. Tr. (Scheer) June 28, pp. 74, 86. (Perez had received

---

[39]The Medication Profile does not fully support Mr. Scheer's view that Perez was generally compliant with his psychotropic medications at this time. After his discharge from the hospital in January 2007, Perez received his first refills of Risperidone, Olanzapine, Clonazepam, and Wellbutrin XL on February 6, 2007, when he saw Dr. Manov, and then for the next six months while he was being seen on an outpatient basis by MHICM staff Perez only received three other refills of Clonazepam (March, May, and June), two refills of Risperidone tablets (May and June), and two refills of Wellbutrin XL (June, August). Plaintiff's Ex. 66.

his first such injection on January 17, 2007, while he was hospitalized, and was to have had another injection two weeks thereafter.  Several refills of this prescribed injection were available to Perez while he was in the MHICM program.  Plaintiff's Ex. 66: USA-71.)

Mr. Scheer testified that, on one occasion, Perez said that he did not need to see a psychiatrist and he no longer needed the MHICM program,[40] but none of Mr. Scheer's later records report that Perez refused to see a psychiatrist; moreover, the notes of Mr. Scheer's meetings and conversations with Perez reveal a ongoing need for psychiatric care for Perez's recurring delusions.[41]  There is some evidence that Perez was not enthusiastic about remaining in the MHICM program, e.g., Mr. Scheer noted in March 2007 that Perez felt he would no longer need to remain in the MHICM program after he divorced his wife, Tr. (Scheer) June 28, p. 89, and in April 2007 Perez again said he would not be needing the help of the MHICM program, Tr. (Scheer) June 28, p. 92, but the evidence does not establish that Perez withdrew from the program on his own.  The VA continued to include Perez in the MHICM program, visiting him at home approximately monthly in April, May, and

_____

[40]Mr. Scheer testified that when he visited Perez on January 25, 2007, that Perez stated that he did not need to see a psychiatrist again, and was not going to attend his next appointment with Dr. Manov; the record reveals, however, that despite Perez's statement, he did attend his nex appointment, on February 6, 2007, with Dr. Manov.  Tr. (Scheer) June 28, pp. 66-67, 70.

[41]For example, in March 2007, Perez told Mr. Scheer that a gypsy had predicted several things in Perez's life, and that Perez was planning to take a trip to Philadelphia to see a "godfather" and get a very large sum of money.  Stip. ¶¶ 74, 75, 76; MR 891; Tr. (Scheer) June 28, pp. 83-85, 89.

June.

In July 2007, Perez was hospitalized for surgery to remove a tumor on his lung; during that hospitalization, Perez required psychiatric care for delusions, hallucinations, and violent behavior. *See infra*. Perez continued to see Mr. Scheer during that hospitalization, and after Perez was released from the hospital in August, Mr. Scheer visited Perez twice before the VA discontinued Perez's participation in the MHICM program. During one of those visits, Perez requested a renewal of Clonazepam to help him to sleep. Tr. (Scheer) June 28, pp. 109, 141.[42] Mr. Scheer's final visit with Perez, on August 30, 2007, marked the end of seven months that Perez had been in the MHICM program. Stip. ¶¶ 69, 72, 78.

The decision to discharge Perez from the MHICM program was made despite Mr. Scheer's update to Perez's treatment plan, dated August 8, which indicated that Perez's problems had not been resolved and he needed to continue with weekly monitoring visits. Stip. ¶ 71, MR 911-913. Moreover, as noted above, Perez had received hospital-based psychiatric care for delusions and violent behavior as recently as one month prior to being discharged from the MHICM program.

Mr. Scheer did not do a discharge summary; in fact, no discharge papers were

---

[42]The Court finds that, according to the VA's Medication Profile, Perez was very compliant with his prescription for Clonazepam, receiving monthly refills after it initially was prescribed in January and continuing until June 2007 (one refill remained available when the prescription expired on August 9, 2007). Plaintiff's Ex. 66: USA-52. The VA records indicate that after August 2007, Perez was prescribed Temazepam 15 mg by his cardiologist, and not Clonazepam, for aid in sleeping, and Perez obtained monthly refills of that medication until March 24, 2008, when he received his last available refill. Plaintiff's Ex. 66: USA-71.

recorded when Perez was discharged from the MCHIM program, Stip. ¶ 73; Mr. Scheer testified that he sent a handwritten document to Connecticut (the document is not part of the record), and that he wanted to keep the door open for Perez to return to the program. Tr. (Scheer) June 28, pp. 14-15.[43] The evidence established that the VA made the decision to terminate Perez's participation in the program, and not that Perez himself withdrew from the program. No ongoing care was scheduled for Perez by the VA after discharging Perez from the MHICM program.

**Surgery at VA**

Perez was admitted to the VA Hospital in Miami on July 9, 2007, for surgery to remove a tumor on his lung, which resulted in the removal of the right lower lobe of his lung (a pulmonectomy). MR 207. During this hospitalization, Perez had hallucinations, delirium, and delusions - reportedly related to the pain medications. VA physicians noted Perez's delusional disorder, MR 420, and reported that an underlying psychiatric disease affected Perez's threshold for delirium, MR 651.

The record reveals that Perez was violently combative and had to be placed in restraints after he tore drapes and threw a cell phone at a nurse; for his safety, Perez was assigned a 1:1 sitter, whom he subsequently hit and threatened to kill (i.e., he had a homicidal intent). MR 626-628, 653-659. He remained in the

---

[43]Shortly after Perez's suicide, Mr. Scheer's position with the MHICM program was terminated involuntarily, which Mr. Scheer at one time felt may have been a type of suspension or demerit as a result of Perez's suicide. Tr. (Scheer) June 28, pp. 128-130.

hospital for another three weeks after these episodes of violence, receiving psychiatric care - the sitter remained assigned to him for several days until he was no longer agitated,[44] along with medical care, and finally was discharged on August 6, 2007.

During this hospitalization, Perez was given Olanzapine and Risperidone, among other medications, and it was noted that the VA would "follow up with primary psychiatrist for evaluation of medication effect and possible dose adjustments," but there is no record that such action took place. MR 626-628. According to the Discharge Instructions, which the Court presumes were given to Perez at the time, Perez was told that appointments needed to be scheduled with the cardiothoracic surgery clinic and that he needed to continue taking his Coumadin and see his "primary care provider," Nurse Heitman for blood testing. MR 206-209, MR 419-420.[45] The notes are silent, however, as to any appointments for psychiatric care, despite the fact that the Discharge Note from the pharmacy indicates that Perez was being sent home with prescriptions for two antipsychotic

---

[44]Shortly after he was transferred from the intensive care unit on July 13, Perez was observed to be anxious and in respiratory distress, MR 722, and was returned to that unit, MR 709. VA physicians observed Perez to be "agitated and somewhat depressed" and noted that they would "restart all patients Psych meds [sic], including a sleeping pill, as per patient request and noting that the patient is feeling agitated and somewhat depressed." MR 717-718. When transferred back to the nursing floor of the hospital on July 16, Perez was assigned the 1:1 sitter for the next five days (the sitter assignment was discontinued on July 20). MR 627-628.

[45]At the time of discharge, on August 6, the record indicates that Perez lived alone, but will have "support from wife and daughter as needed" and that the family is "aware and in agreement with" the discharge plans. MR 417-419.

medications: 10 mg of Olanzapine twice daily (a reduction from the 20 mg of Olanzapine twice daily prescribed by Dr. Manov the prior year),[46] and Risperidone (1 mg tablets, half of which to be taken twice daily),[47] - both of these prescriptions were provided with one refill; he already had a prescribed antidepressant (150 mg of Wellbutrin XL daily).  MR 411-412.[48]

## Scheduling of VA appointments

Defendant urged this Court to find that Perez was noncompliant with scheduled appointments for psychiatric care at the VA, but the record does not support such a finding.  Indeed, the VA itself cancelled Perez's first follow-up appointment (for March 7, 2006) and made no effort to reschedule the appointment that Dr. Manov had indicated should have been set for one month after the initial appointment in February.[49]  Perez was hospitalized on April 7, and after his

---

[46]The prescription for 10 mg of Olanzapine was issued and filled on August 6, and then the only available refill was received on August 30.  Plaintiff's Ex. 66: USA-69.  This prescription replaced the prescription for 20 mg of Olanzapine which had been issued by Dr. Manov.  See, e.g., MR 370-374.

[47]The prescription for Risperidone tablets was issued and filled on August 6, with one refill available; the refill remained available until the time of Perez's death.  Plaintiff's Ex. 66: USA-70.

[48]The record reveals that each time Perez was hospitalized, the physicians at that hospital issued prescriptions of short  duration, e.g., one month's supply, with at most one refill beyond the first month.  This may have been a deliberate effort to encourage the treating psychiatrist to take over the management of the prescriptions promptly.

[49]Dr. Manov admitted at trial that the VA did not follow-up with phone calls or letters after the VA cancelled Perez's appointment scheduled for March 7.  Tr.

discharge, he saw Dr. Manov at an appointment on April 13.  When an appointment was scheduled for shortly after this second session with Dr. Manov, Perez rescheduled the appointment - in compliance with Dr. Manov's recommendation that Perez be seen for a follow up appointment in one month, i.e., Perez was next seen at an appointment on May 12.  After May 12, the VA failed to schedule any appointment or make any attempt to do so, despite Dr. Manov's indication that a follow-up take place in one month.  The record reveals that Perez did not initiate the scheduling of an appointment at this time, but this single incident is not evidence that Perez generally was non-compliant with scheduled appointments.

In 2007, Perez saw Dr. Manov on February 6, shortly after Perez was discharged from the VA hospital (where he had been receiving intensive psychiatric care for three weeks).  Dr. Manov told Perez to return in six months, and the VA placed Perez into a "recall" status, according to which the VA would contact the patient by letter as the sixth month approached, and ask the patient to call the VA to schedule an appointment.  Tr. (Haber) July 1, p. 129.[50]  According to the Defendant, two letters were sent to Perez requesting him to schedule an appointment with Dr. Manov; the letters reportedly were sent on July 4 and August

---

(Manov) June 28, pp. 30, 24-25.

[50]Dr. Manov testified that he had no role in the VA's scheduling system, and that he was simply a cogwheel in the system.  Tr. (Manov) June 28, pp. 180-181.
"Q: So, the psychiatrists that are seeing the people, they are not in tune with the scheduling system that the VA has, correct, sir?
A: Take it up with the VA.  Don't ask me."
Tr. (Manov) June 28, p. 181.

13, 2007, but copies were not produced as evidence. A notation in the record states that the letters were sent and that a phone call was made to Perez on September 7; the record also reveals that Dr. Manov was notified of this non-response from Perez, and he admitted at trial that he received this notice. MR 368, Tr. (Manov) June 29, p. 100.[51] Despite the VA's claimed difficulty in locating Perez, VA records reveal that Perez was hospitalized at the VA from July 9 through August 6, 2007 (for lung surgery) and also was seen by other departments of the VA for medical care on at least eight occasions over the next two months (August 9, 13, 16, 23, 28, 30, September 6, 20). Plaintiff's Ex. 6.

When Perez was discharged from the hospital on August 6, he was sent home with prescriptions for two psychotropic medications; however, the VA failed to schedule an appointment for Perez to see Dr. Manov for medication management or psychiatric care - despite a notation that the VA would do so. Perez continued to be seen by Mr. Scheer, in the MHICM program, for three more weeks after Perez left the hospital, until the end of August 2007, and upon his discharge from the MHICM program the VA did not schedule any appointments for Perez to receive psychiatric care with Dr. Manov - or anyone else. There also was no evidence that Perez was ever told by the staff of the MHICM program that he should schedule an

---

[51]VA records include a "Call for Appt"noted on July 11, 2007, with a corresponding entry of "Inpatient/No Act Taken" - which the Court interprets as evidence that Perez was to be contacted on that date (which was five months after his February appointment with Dr. Manov) to schedule an appointment but, due to his hospitalization, no action was taken. Plaintiff's Ex. 6, MR 368 (noting that a "call for appointment letter" was mailed to Perez on July 4 and August 13, 2007).

appointment with Dr. Manov.

From September 2007 through January 2008, on at least a monthly basis, Perez continued to keep appointments with other medical departments of the VA, including at a clinic he regularly visited regarding his HIV-related medications. The Court finds that Perez's willingness to attend to other medical needs and to keep appointments with other departments of the VA medical system indicates, at a minimum, that Perez might have been willing to attend properly scheduled appointments for mental health care.

**Other care provided to Perez**

Brenda Heitman, an Advanced Registered Nurse Practitioner (ARNP), was employed by the VA at the Oakland Park Outpatient Clinic ("Clinic") during the time that Perez was receiving care at the Clinic. Her primary duty was to treat patients with HIV or AIDS; for example, she assisted patients, including Perez, with their HIV-related medications. Tr. (Heitman) July 7, pp. 4, 9-10, 13-15, 65. According to Nurse Heitman, Perez regularly appeared for his appointments at the Clinic to have his blood tested and also spoke with the pharmacist frequently, as the pharmacist was responsible for monitoring his blood clotting factors while he was taking a prescription blood thinner after his lung surgery in July 2007. Tr. (Heitman) July 7, pp. 16, 72, 87-88.

Nurse Heitman met with Perez at least monthly after his discharge from the MHICM program in August 2007 and continuing until January 2008. On two of

those occasions when Perez saw Nurse Heitman during this period, on August 30
and October 4, 2007, Perez was given a screening test for depression, which
revealed that he was depressed.  MR 386, MR 364, Tr. (Heitman) July 7, pp. 32-33.

On August 30, Perez was not only depressed, but also appears to have
demonstrated some insight or awareness of his mental illness - unlike other
occasions when it was noted that he did not feel that he needed psychiatric care; for
example, he requested a renewal of his psychotropic medications[52] when he saw
Nurse Heitman (he apparently did not have the required form in order to request a
renewal).  MR 380, Tr. (Heitman) July 7, p. 28.[53]  At that appointment, she recorded
that Perez was on Risperidone, Wellbutrin, and Olanzapine, and was being
"[t]reated by psychiatry" and "currently on medication for depression."  MR 381,
386.  (Apparently Nurse Heitman did not know that the VA was terminating
Perez's participation in the MHICM program at this same time, nor did she check
the records to see that Perez had only sporadically been receiving his
antidepressant.[54])  The VA's record is silent as to why the requested renewals were

---

[52]The prescription for Clonazepam (which Perez had been taking monthly)
recently had expired, Perez had no refills remaining as to the prescription for 10 mg
of Olanzapine which he filled for the last time on the date of this appointment with
Nurse Heitman, and he only had one refill remaining for the Risperidone tablets
which had been prescribed at the time of his discharge from the hospital earlier in
the month.

[53]On August 30, 2007, the VA recorded that Perez had no "missed doses/other
non-adherence" as to his prescribed medications.  MR 377-378.

[54]Perez had refilled his prescription for Wellbutrin XL only one time, on June
6, since his last appointment with Dr. Manov on February 6, 2007; Perez had

never ordered.  Plaintiff's Ex. 66.  At trial, Nurse Heitman testified that Perez "knew" the process for seeking renewals, and that he knew that he could see Dr. Manov to get a renewal, or he could go to the pharmacist and ask the pharmacist to talk to Dr. Manov to order a renewal, Tr. (Heitman) July 7, pp. 29-30, but that day Perez, who was observed to be depressed, had specifically asked Nurse Heitman for assistance with his renewals and she did not document that she provided any assistance.[55]  At trial, she said that she told Perez to see the pharmacist.  Tr. (Heitman) July 7, p. 28.

When Perez was seen at the Clinic on October 4, 2007, he reported to Nurse Heitman that he felt "down, depressed or hopeless" and had little interest or pleasure in doing activities on more than half of the days.  MR 364.  Nurse Heitman did not refer Perez for a psychiatric consult on this date, and instead simply noted that Perez "is currently being followed in a Mental Health clinic for depression," MR 364, even though Perez had been discharged from the MHICM program six weeks earlier, and had not seen Dr. Manov in the past eight months - which was evident from the records.

The notes of this visit include the computer-generated list of "Active and Recently Expired Outpatient Medications," which reveals that there were two refills

---

received the antidepressant while hospitalized in July.  MR 693-694.

[55]On that same date, Nurse Heitman documents that she contacted other VA medical staff on Perez's behalf regarding a change in the dosage of a prescription for Perez's blood pressure, and was successful in adjusting that medication.  MR 381.

remaining of Wellbutrin XL, only one refill available for Risperidone tablets, and no refills remaining for Olanzapine 10 mg; the list also reveals that Perez had not received the long-acting injection of Risperidone since February 6, 2007 (eleven refills remained).  MR 358-364, Tr. (Heitman) July 7, p. 43.  The prescriptions for all other psychotropic medications which at one time had been prescribed to Perez (Abilify, Seroquel, Clonazepam, and Olanzapine in 20 mg dosage), had expired, been discontinued, or had no refills remaining.  Plaintiff's Ex. 66.  At this appointment in October, Nurse Heitman knew or should have known that the only psychotropic medications prescribed to Perez were Wellbutrin XL and Risperidone. This record demonstrates the VA's knowledge that Perez was not receiving his psychotropic medications through late 2007 and early 2008; at that time, the VA failed to either issue new prescriptions or renew existing prescriptions (Perez had no refills remaining for Olanzapine 10 mg).[56]

Nurse Heitman admitted that she could have requested a psychiatric consult for Perez at any time if she had realized that Perez was not regularly refilling his prescriptions for psychotropic medications, but claimed that she did not see a need to do so because he had a prior psychiatric consult and they originally had prescribed the medications (and, presumably, were monitoring his care).  She also testified (although nothing relevant is recorded in the Progress Notes she prepared

---

[56]Nurse Heitman admitted that she had the ability at any time to confirm whether Perez was getting his psychotropic medications as prescribed, Tr. (Heitman) July 7, pp. 28-31, but the record reveals that she (and others at the VA) failed to do so on a regular basis.

on those dates) that she decided not to seek a psychology consult for Perez in either August or October 2007, nor did she decide to contact Dr. Manov, because she believed that Perez was only depressed because he was having trouble breathing and not getting his strength back quickly after his lung surgery.  Tr. (Heitman) July 7, pp. 32-33, 43-44, 116.  None of Nurse Heitman's notes of September 6, 2007 (MR 370-375),[57] October 4, 2007 (MR 358-364),[58] and January 17, 2008 (MR 337-343)[59] - the only times he was seen by her after his discharge from the MHICM program in August 2007 and before his visit to the Clinic in April 2008 - record any observations as to Perez's mental competency.

Nurse Heitman asserted at trial that even if she had requested a consult it did not mean that Perez would have been willing to see the psychiatrist, Tr. (Heitman) July 7, pp. 111-113; however, throughout 2006 and 2007 Nurse Heitman never documented that Perez did not want to see a psychiatrist or take his psychotropic medications, Tr. (Heitman) July 7, p. 21 - indeed Perez himself had requested a refill of those medications from Nurse Heitman in August 2007, but the

---

[57]Perez reportedly was "concerned regarding finances; receives social security but not sufficient to meet his bills and purchase nutritional supplements."  MR 371.

[58]As discussed, above, Perez had not passed a screening for depression in October 2007.

[59]On January 17, 2008, Perez reportedly was in "good spirits" and requested a renewal of Temazepam, MR 338, a medication which he took to help him sleep, which was issued the following day.  Perez obtained two refills of this medication, on February 7 and March 24, and no refills remained after March 24.  Plaintiff's Ex. 66: USA-71.

requested refill was never ordered, nor were any new prescriptions of psychotropic medications ever again issued for Perez.  Plaintiff's Ex. 66.

Nurse Heitman saw Perez on January 17, 2008, and noted that Perez was in good spirits and had enjoyed his daughter's visit over the holidays.  MR 337-338. Perez requested a renewal of Temazepam, MR 338, which was issued the following day.[60]   Nurse Heitman notes that Perez's delusional disorder is "Treated by psychiatry.  respiradone [sic], bupropium, [sic] olanzapine."  MR 338.

Perez did not visit the VA at all - not even for general medical care - for approximately eight weeks, from January 29 to March 27, 2008.  This deviation from his normal pattern of regular visits was also evident the prior year, when Perez absented himself from any care at the VA for twelve weeks immediately prior to his hospitalization for psychiatric care on December 30, 2006.   No one from the VA appears to have noticed these absences or taken any steps to ensure that Perez was contacted during those times in an effort to monitor his mental health.

In summary, after Perez was discharged from the MHICM program at the end of August 2007, most of his prescriptions for psychotropic medications expired and were not renewed by the VA, even though Perez visited Nurse Heitman approximately twice per month and, on at least one occasion, requested renewals of his prescriptions.  During the last eight months of his life Perez received no

---

[60]The prescription for 15 mg of Temazepam was issued on January 18, 2007, and filled on that same date; Perez received one refill on February 7, and another - the last remaining refill - on March 24.  Plaintiff's Ex. 66: USA-71.

antipsychotic medications,[61] and only received three refills of his antidepressant medication before that prescription expired.  The VA "treatment" plan for Perez at this time included no appointments scheduled for psychiatric care, no monitoring of his prescriptions for antipsychotic medications, a limited prescription for an antidepressant (the prescription expired, without the VA taking any action, after Perez received his final refill on January 4, 2008), a limited prescription for an antipsychotic (the prescription for the long-acting injection of Risperidone expired in February 2008, without the VA taking any action), no group counseling, no participation in the MHICM program, and no attempt to seek family assistance. When Perez was seen for general medical care by Nurse Heitman and others, no members of the VA staff addressed this lack of psychiatric treatment and care. Without a referral to psychiatric care, Perez was not going to receive any new prescriptions for psychotropic medications nor any renewals of his existing prescriptions for psychotropic medications.

**Outpatient Clinic visit on April 3, 2008**

On April 3, 2008, Perez made an unscheduled visit to the Clinic.  Tr. (Heitman) July 7, pp. 94-95.  According to Nurse Heitman, Perez arrived on April 3

---

[61]Perez only had an active prescription for Risperidone; the prescription for 1 mg tablets had one remaining refill - he had not refilled this prescription since his discharge from the hospital in August 2007, and there were eleven remaining refills of the 25 mg injection - which he had not received since his last appointment with Dr. Manov in February 2007.

with concerns about bruising and bleeding on his arms and also to request

medications for erectile dysfunction. Tr. (Heitman) July 7, pp. 38, 99, 103, 119.[62]

Perez reported to Nurse Heitman that the cult which had been pursuing him had

now infiltrated his home and stolen all of his identification papers, and the FBI was

not helping him. Stip. ¶¶ 82-83, MR 330-331. Perez told her that he was worried

that the cult also had infiltrated the VA lab and he was not taking his medications

because he did not trust the lab results nor the medications he had received by

mail, and because he believed that the medications were causing his skin to bleed.

MR 320, 329-330.[63] Nurse Heitman recorded that Perez "does not want to be seen

by psychiatry or social work and says will walk out if they are contacted." MR 331.

At trial, Nurse Heitman said Perez's drop-in visit to the Clinic on April 3 was

unique, as she had never previously experienced Perez's mental health as

questionable during any of her visits or communication with him. Tr. (Heitman)

July 7, p. 33. She noted that Perez had not followed up with psychiatry and was not

taking his "medications ordered," MR 330-331, Tr. (Heitman), July 7, p. 36, but at

trial she admitted that she did not check the notes that day and therefore did not

know that Perez had not been seen by Dr. Manov for fourteen months, or that Perez

―――――――――――――

[62]Nurse Heitman documented that Perez requested "Viagra for sexual
enhancement" that day. MR 330-331. Perez had an existing prescription for
another erectile dysfunction medication, Levitra.

[63]She also noted some bruising on his arms and notes "[s]tates has had
bruising on upper arms previously but did not mention to staff." She observed that
it was "not clear if he injured his arms with his sofa." MR 331.

had not been receiving any anti-anxiety or antipsychotic medications and only had received three monthly refills of his antidepressant medication in the past eight months; she also did not know about the delusional girlfriend or, importantly, that Perez had expressed suicidal or homicidal ideations during his four hospitalizations in the prior two years (including a hospitalization only eight months prior to the date of this Clinic visit).  Tr. (Heitman) July 7, pp. 36-39.[64]  Had she checked the VA's computer system, she would have seen that all but one of the prescriptions for psychotropic medications had expired several months earlier and had not been renewed by the VA; the only medication currently prescribed to Perez was for Risperidone tablets, and only one month's refill remained available since he last received the medication in August 2007.

Nurse Heitman called another nurse into the examining room with Perez. Carmina Fogarty, RN, was asked to see if Dr. Manov would come to the clinic to see Perez since he was unwilling to go to the mental health area.  Although Perez appeared calm at the time, Nurse Fogarty was not sure what might happen, and called for a VA police security officer.  Tr. (Fogarty) July 8, p. 16.  Nurse Heitman testified that Dr. Manov was summoned to the clinic to see Perez because Heitman was concerned that Perez wasn't taking his HIV medications, Tr. (Heitman) July 7, p. 34; however, the records reflect that Nurse Heitman requested an urgent mental health evaluation of Perez because he was "not on psychotropic medications;

_____

[64]Perez had received inpatient psychiatric care in February 2006, April 2006, December 2006-January 2007, and July - August 2007.

43

stopped himself; with delusions of a cult after him." MR 216-217. Again, the Court notes that at this time Perez only had one prescription which remained active (1 mg Risperidone tablets) and that prescription only had one refill available, so the notation that he had "stopped himself" is somewhat misleading.

Dr. Manov's office was approximately 100 feet from Nurse Heitman's office. Dr. Manov came to the clinic, and then walked back to his office with Perez before escorting Perez down the hallway to the pharmacy. Tr. (Manov) June 29, pp. 104, 126. Dr. Manov later recorded, under the topic "Current Psych Meds" in the VA's progress note of that psychiatry consultation, that Perez had not been taking any medications "since he believes that the meds are switched by the gang, and the meds cause bleeding in his skin." Stip. ¶ 84, MR 327. According to his trial testimony, Dr. Manov's purpose when he was called by Nurse Heitman to see Perez was to help Perez "be compliant with the [HIV] medication." Tr. (Manov) June 29, pp. 103-104. The Court finds that neither Nurse Heitman nor Dr. Manov were credible when they testified that the primary reason for Dr. Manov to be summoned to the Clinic was because Perez was not taking his HIV medications. Nurse Heitman admitted that prior to that day, she had never seen Perez when he was delusional; she had witnessed him "down" but had attributed that to his difficulty breathing post-surgery on his lung. Tr. (Heitman) July 7, pp. 86-87. Clearly, his appearance and demeanor that day had caused Nurse Heitman to have concerns about his mental health such that she requested an urgent evaluation by the psychiatrist assigned by the VA to care for Perez.

44

Dr. Manov testified that he spoke with Perez for thirty minutes on April 3, Tr. (Manov) June 29, p. 121, and that Perez had an inappropriate affect, poor insight, poor judgment, and was still convinced of his delusions that a gang was pursuing him.[65] Despite the fourteen months which had passed since Dr. Manov had evaluated Perez, Dr. Manov adopted the same diagnosis as in the past, i.e., that his patient, Perez, was suffering from a delusional disorder.[66] Dr. Manov testified that Perez "didn't like seeing psychiatrists or social workers due to his paranoid system, but he knew me. He has known me for a long time, so he didn't mind talking to me on this date." Tr. (Manov) June 29, p. 105.[67] Dr. Manov clearly considered himself to be Perez's treating psychiatrist and it is undisputed that the

---

[65]At trial, Dr. Manov testified that he viewed Perez as "chronically psychotic" and that the term "psychotic" indicates that someone is "not normal." Tr. (Manov) June 29, p. 27.

[66]Although Dr. Manov had not seen Perez for fourteen months, and although the VA records of Perez's hospitalization in July 2007 reveal that Perez had experienced hallucinations, Dr. Manov did not reference this history in the notes of his meeting with Perez on April 3. At trial, Dr. Manov testified that one of the criteria in diagnosing schizophrenia is the presence of hallucinations; Dr. Manov still did not diagnose Perez with schizophrenia when he saw him at the Clinic on this date, even though Perez had experienced hallucinations while he was hospitalized the prior year. Tr. (Manov) June 29, pp. 56-58. Dr. Manov testified at trial that "History has nothing to do with it." Id.

[67]Although Dr. Manov testified that Perez was afraid to see psychiatrists, there is no documentation of this issue by Dr. Manov at any of his meetings with Perez. Tr. (Manov) June 29, p. 139. Other than Nurse Heitman's observation on April 3, the only other record of this alleged reluctance by Perez to see psychiatrists was Mr. Scheer's note in January 2007 that Perez had said that he did not need to see a psychiatrist (but note that he did see Dr. Manov for an appointment shortly thereafter). Tr. (Scheer) June 28, pp. 66-67, 70.

VA was the sole provider of psychiatric treatment for Perez during the final two years of his life.

Dr. Manov noted in the medical record that Perez denied that he would take his own life or that of someone else, Stip. ¶ 87, Tr. (Manov) June 29, pp. 111-112; he asked Perez a set of questions, a "depression screening" required by the VA,[68] to evaluate his mental status and Dr. Manov was satisfied with the results, MR 327-330, Tr. (Manov) June 29, pp. 111, 120-121.  At trial, Dr. Manov asserted that although Perez was not happy about his life,[69] he was not suicidal and he wasn't "depressed in the sense that he should be grabbed and prevent him from suicide, Baker Act him for eternity."  Tr. (Manov) June 29, p. 121.  Dr. Manov recorded that Perez's current psychotropic medications were Risperidone, Olanzapine, Clonazepam, and Wellbutrin, and that "[n]o changes were made to active outpatient medications." MR 327, 330.[70]  He recorded "n/a" as to the efficacy of current

_____

[68]The record of that date includes a "Depression Screening" which posed questions as to whether, for example, in the past two weeks, Perez had been bothered by: "Little interest or pleasure in doing things" or "Thoughts that you would be better off dead or of hurting yourself in some way;" Perez's reported answer to each question was: "Not at all."  MR 328-330. 2007.  The questions are a template included in the computerized system, as the same screening questions had been posed to Perez by Nurse Heitman when he was found to be depressed several months earlier, in August, MR 386, and October, MR 364.

[69]Perez told Dr. Manov that he now was divorced and lived in an apartment by himself.  MR 330.

[70]Dr. Manov incorrectly recorded that Perez had current prescriptions for Clonazepam (expired in August 2007, Plaintiff's Ex. 66: USA-52), and Wellbutrin XL (Perez had received the last available refill on January 4, and the prescription had expired on February 7, Plaintiff's Ex. 66: USA-51, see also, MR 320-326 (Clinic

medications and therapy, MR 326-327, and made no changes to Perez's only active prescription, for Risperidone tablets. MR 330. Dr. Manov noted that he "renewed" the prescription for Risperidone, but he doubted that Perez would take the medication. MR 327-328. (Indeed, the VA's Medication Profile reveals that Dr. Manov did not issue a new prescription for 1 mg of Risperidone nor did he renew the existing prescription which had been issued while Perez remained in the hospital, and distributed on the same date of issue, August 6, 2007; the prescription had only one refill remaining. Plaintiff's Ex. 66: USA-70.) At trial, Dr. Manov claimed that there was no basis to switch Perez's medications, or to give him a long-acting injection of antipsychotic medication at that time, as "[e]verything was going the way it was supposed to go." Tr. (Manov) June 29, pp. 122-123.

Despite Dr. Manov's assessment that everything was proceeding with Perez's treatment "the way it was supposed to go," the record reveals that Perez had no psychotropic medications available to him other than one month's supply of Risperidone tablets, and he also was reported to have been drinking heavily. Dr. Manov escorted Perez to the pharmacy in an effort to assure Perez that the medication was safe and had not been poisoned by a cult, but did not remain there long enough to discover whether Perez filled or refilled his prescription for Risperidone that day. Tr. (Manov) June 29, pp. 55, 126. Nurse Heitman's notes

---

record dated April 10, 2008, which includes VA's computerized list of Perez's prescriptions, indicating that the prescription expired in February)); nor did Perez have any refills available in the prescription for Olanzapine (Plaintiff's Ex. 66: USA-69, see also, MR 320-326 (the last refill had been received August 30)).

47

indicate that Perez would be on a "drug holiday" and would not take his medications until he returned to the Clinic the following week for his already scheduled immunology appointment.  MR 331.

At the end of his consultation with Perez, Dr. Manov concluded that Perez was "[a]lready receiving needed treatment," MR 330, and Perez was not admitted for inpatient care on that day, Stip. ¶ 4.  Instead, Dr. Manov told Perez to return for an appointment in six months.[71]  At trial, Dr. Manov testified that he decided to wait such a long time for a follow up appointment because Perez was "paranoid and I didn't want him to feel I was watching him, didn't want him to think I was part of gang."  Tr. (Manov) June 28, p. 30, June 29, p. 59.  Perez left the Clinic after seeing Dr. Manov and later went on to the lab at the VA.  Tr. (Heitman), July 7, p. 101.

**Outpatient Clinic visit on April 10, 2008**

One week later, on April 10, 2008, Perez arrived at the Clinic and again was seen by Nurse Heitman.  Stip. ¶ 5.  This would be Perez's final visit to any VA health care provider.  Nurse Heitman recorded that Perez still believed, on April 10, that "a cult is after him and that the VA has been infiltrated and [Perez] does not trust the mail or the lab."  Stip. ¶ 85.  However, she also recorded that before he left the Clinic that day, Perez was willing to have the medications (including the Viagra

---

[71]No appointment was scheduled for six months from April 2008, and it appears that Perez would have been in the VA's "recall" system and would not have been contacted until the fifth month, i.e., October 2008, to schedule an appointment.

he continued to request) mailed to his home as he no longer was worried about the cult infiltrating the postal system and he did not want to wait at the Clinic for the pharmacy to fill his prescriptions.  MR 321.  According to Nurse Heitman's notes, Perez "plans to go to Latin America end of May for a visit... [and he requested] Viagra for erectile dysfunction."  MR 320-321.  Nurse Heitman told Perez to "contact clinic next week for results of labs."  MR 323.

Nurse Heitman noted that Perez admitted to her, apparently for the first time in their history of care over the past two years, that he had been drinking the night before and had consumed a bottle of wine and some gin.  MR 321, Tr. (Heitman) July 7, p. 104.[72]  At this visit, Perez apologized to Nurse Fogarty for his behavior the prior week.  Tr. (Fogarty) July 8, p. 19.  Nurse Heitman noted that Perez "was seen last week by Dr. Manoff [sic] to evaluate patient who is delusional not on medications."  MR 321.  The VA's Clinic staff did not ask Perez whether he was suicidal or homicidal, and they did not request a psychiatric consult for Perez on that day nor schedule an appointment for future psychiatric care.  VA staff also did not note whether Perez had received the only psychotropic medication available to Perez (one month's supply of Risperidone tablets) at that time (all other prescriptions had expired, been discontinued, or had no remaining refills).[73]  No

---

[72]Perez had denied alcohol abuse when he saw Nurse Heitman for previous appointments, but she had documented prior evidence that he abused alcohol.  See, e.g., MR 1087.

[73]Nurse Heitman noted that Perez was "not taking any psy. medications but appears willing to restart his hiv meds."  MR 320-321, Tr. (Heitman) July 7, p. 51.

psychiatrist saw Perez on that day.

### Perez's family and his final days

Neither Plaintiff nor her mother were afraid of Perez,[74] and they did not believe that he was suicidal, Tr. (Maria Jose) June 27, pp. 83-84; Tr. (S. Perez) June 27, pp. 148-150.  Maria Jose Perez, Perez's only surviving child and the Plaintiff in this action, was attending Georgetown University at the time of her father's death. Plaintiff's Ex. 53.  Plaintiff knew that her father had a serious mental illness, and after she observed that his delusions were getting worse after she had been at home for a visit in March 2008, she asked her mother to call the VA.  Tr. (Maria Jose Perez) June 27, pp. 61-62, 81.[75]

On April 6, just four days before his final visit to the VA, Perez had lunch with his former wife to celebrate his birthday.  Tr. (S. Perez) June 27, p. 128.[76]  The

---

[74]Plaintiff testified that she was afraid of her father on only one occasion, when he was extremely delusional and ultimately hospitalized in December 2006. Tr. (Maria Jose Perez) June 27, pp. 84-85.

[75]Plaintiff herself had been receiving mental health counseling while at college, and notes from 2007 through 2008 reveal that she was worried about her father.  At a session on March 14, 2008, she noted that her father might kill her during her upcoming visit home for spring break, Defendant's Ex. 3, GEO 107; after she returned from that visit she described on April 4 that her father's increasing psychotic symptoms were overwhelming to her, Defendant's Ex. 3 GEO 105.

[76]According to records of Perez's hospitalization in July 2007, Perez reported that he and his wife were still friends even though they were divorcing, MR 500-501, and the record demonstrates that they remained in relatively frequent contact, e.g., they saw each other approximately every other week, and Perez drove a vehicle owned by Sandra Perez, Tr. (S. Perez) June 27, pp. 126, 150-151.  The VA's records

next day, Sandra Perez received a call from a police officer who was a neighbor of

Perez; the officer indicated that Perez had shared his delusions with her and told

her of his belief that the cult had broken into his apartment. Sandra Perez then

called her husband, who reported to her the same delusional belief he had shared

with his neighbor. Sandra Perez then called Mr. Scheer. Tr. (S. Perez) June 27, pp.

127-130. When Mr. Scheer returned her call on April 8, she told Mr. Scheer that

Perez had been switching his medications around, thinking that people were out to

get him, and that he had not been taking his medications and had become very

delusional. MR 327, Tr. (S. Perez) June 27, p. 130, Tr. (Scheer) June 28, pp. 47-48.

She reported that Perez was adamant that he needed no psychiatric care and,

because of this, she didn't want Mr. Scheer to tell Perez that she had called. MR

326-327. Mr. Scheer documented his conversation with Sandra

Perez, but didn't take any further steps after he tried unsuccessfully to reach

Perez by phone. Tr. (Scheer) June 28, pp. 55-56. Mr. Scheer decided against calling

Nurse Heitman (or anyone else at the VA) because he believed that Perez's

delusions were not such that he was going to hurt himself or someone else, and that

it was Perez's choice "of not having contact with us." Tr. (Scheer) June 28, pp. 48,

139. Although Mr. Scheer had documented Sandra Perez's comments, her concerns

apparently were not brought to the attention of Dr. Manov, nor did anyone who saw

---

created during Perez's hospitalization in July 2007 indicate that Sandra Perez is his
"Next of kin" and include her phone number for contact; she already is described as
his "ex-wife" in this VA record. MR 714-716.

Perez at the VA Clinic on April 10 know about the information provided by his ex-wife just two days earlier.

Plaintiff regularly spoke with her father by phone. Tr. (Maria Jose Perez) June 27, p. 63. On Saturday, April 12, 2008, Plaintiff spoke with her father by telephone several times; during one of their telephone conversations that day,[77] she told her father to give her some time because she was trying to study and he was delusional during the calls; she reported to her mental health counselor on April 18 that she had told her father she did not want to speak with him until the summer.[78] Defendant's Ex. 3, GEO 0103; Tr. (Maria Jose Perez) June 27, pp. 57, 72-73. When she called back a few days after April 12, she was unable to reach her father. Tr. (Maria Jose Perez) June 27, pp. 63-64. Plaintiff testified that during those telephone calls on April 12, Perez expressed no suicidal thoughts. Tr. (Maria Jose Perez) June 27, p. 57. Perez later told his former wife about the several calls he had with their daughter on that date, and that she had told him at the last call that she couldn't speak to him for a while, but he did not express any suicidal thoughts as a

---

[77]There was mistaken testimony, which was later corrected, that this call took place on April 10.

[78]This was not the first time that she had told her father that she needed some distance between them. Records from Plaintiff's university indicate that in September 2007 she had withdrawn from communicating with her father as she struggled to deal with him, and she also feared that her distance from him had caused his psychosis. Defendant's Ex. 3, GEO 0142. Nor was it the only time that she and her father were at odds - Mr. Scheer testified that Perez reported in late January 2007 that his daughter was angry with him because of the impending divorce. Tr. (Scheer) June 28, pp. 71-72.

result of that call.  Tr. (S. Perez) June 27, p. 134.[79]  Perez and his daughter were scheduled to travel to Ecuador (to visit Perez's family) in late May 2008, Tr. (Maria Jose Perez) June 27, p. 73, as they had done on several prior occasions, and there was no evidence that the trip was cancelled prior to Perez's death.

Plaintiff and her mother both knew that there was an old and rusty pistol in the home.  Plaintiff testified that she didn't consider the gun as a weapon as she had been told that the gun was inoperable - one of her mother's co-workers had looked at the gun some time earlier (due to an interest in pre-World War II memorabilia) and reported that it would not fire.  Tr. (Maria Jose Perez) June 27, pp. 66, 95-97; Tr. (S. Perez) June 27, pp. 120-123.  Neither Plaintiff nor her mother knew that Perez kept the pistol loaded.  Tr. (Maria Jose Perez) June 26, p. 95; Tr. (S. Perez) June 27, p. 122.

On April 19, 2008, after not being able to reach Perez by phone, Sandra Perez called in a welfare check to local police.  Upon arrival, the police discovered the body of Perez, whom had committed suicide by a self-inflicted gunshot wound to his head.  Stip. ¶ 7.[80]

On July 2, 2008, Mrs. Perez met with the head of the VA psychiatry department and other VA staff (including Dr. Manov and Nurse Heitman), and was

---

[79]Perez spoke with Sandra Perez for the last time at approximately 5:30 p.m. on April 14, 2008.  Plaintiff's Ex. 40 (Autopsy).

[80]A defense witness testified that the death probably occurred on either April 17 or 18.  Tr. (Lessin), July 1, p. 123.

told that Perez had "slipped through the cracks," Tr. (S. Perez) June 27, p. 135.

Nurse Heitman recalled that someone also said that the VA had "dropped the ball."

Tr. (Heitman) July 7, p. 61. Dr. Vara testified that this meeting specifically did not

address liability for the suicide, and when he said that things could have been done

better, he meant those words as a general statement because "in terms of out-

patient suicides, there are usually many things that fall through the cracks." Tr.

(Vara) July 1, pp. 22-26, 33.

## CONCLUSIONS OF LAW AND ADDITIONAL FINDINGS[81]

In a medical negligence action, a court initially must determine what duty

was owed to the patient by the health care provider. Duty is often described in

terms of compliance with a prevailing standard of care; for example, a health care

provider has a duty to "'use the ordinary skills, means and methods that are

recognized as necessary and which are customarily followed in the particular type of

case according to the standard of those who are qualified by training and experience

to perform similar services in the community or in a similar community.'" Sweet v.

Sheehan, 932 So.2d at 368. After determining, as a question of law, what duty

existed, a fact finder then must make a determination as to whether the greater

weight of the evidence establishes that the duty was breached. A health care

---

[81]Some of the conclusions stated in this section of the Court's Order also involve factual findings (e.g., the question of whether the standard of care was breached).

provider is obligated to conform its conduct to the prevailing standard of care or else that provider will be held liable for damages proximately caused by its failure to do so.

## 1.  The VA's liability for failing to meet its duty to Perez

The requirement of "reasonable, general foresight is the core of the duty element." McCain v. Fla. Power Corp., 593 So. 2d 500, 503 (Fla. 1992).[82]  A duty is established "when the acts of a defendant in a particular case create a foreseeable zone of risk." Pate v. Threlkel, 661 So. 2d 278, 280 (Fla. 1995).  "'[E]ach defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result.'" Id., quoting McCain.

There are few reported decisions in Florida addressing what duty is owed by health care providers when treating patients with severe mental illness.  As a general matter, Florida's medical negligence law imposes liability for negligence in the provision of any medical diagnosis, treatment or care.[83]  The Court's analysis,

---

[82]The existence of a duty is a legal question determined by whether a general zone of foreseeable danger was created, as compared to the factual question of whether a defendant's activity foreseeably caused a specific harm.  Williams v. Davis, 974 So. 2d 1052, 1057 (Fla. 2007) (applying "zone of risk" analysis of McCain to determine that residential property owners with overgrown foliage on their property do not owe a duty to adjacent motorists).

[83]See, e.g., Fla. Stat. § 766.102(4), and the relevant provisions of Fla. Stat. § 95.11(4)(b) (describing applicable statutes of limitations).  The Supreme Court of Florida has held that the terms "diagnosis," "treatment," and "care" are unambiguous and should be accorded their plain meaning.  Silva v. Southwest Fla. Blood Bank, 601 So. 2d 1184, 1187 (Fla. 1992) (holding that a blood bank was not a

below, adopts that framework in determining whether the VA breached its duty to Perez by deviating from the standard of care.

Courts rely primarily on expert testimony when determining the applicable standard of care.  Pate, 661 So. 2d at 281.[84]  At trial, the Court was assisted by the opinions of the parties' hired expert witnesses: Jerald H. Ratner, MD,[85] for the Plaintiff, and Michael C. Hughes, MD,[86] for the Defendant.  These witnesses each had substantial experience as psychiatrists, and were accepted by the Court as experts as to the applicable standard of care in psychiatric treatment.  Tr. (Ratner) June 29, p. 13, Tr. (Hughes) July 8, p. 42.[87]

---

"provider of health care" that rendered "diagnosis, treatment, or care" and therefore shorter statute of limitations applicable to medical negligence claim did not apply).

[84]Although the main source of information as to the standard of care in a medical negligence case is expert testimony, the provisions of section Fla. Stat. § 766.102 do "not preclude the introduction of other evidence," e.g., a violation of a defendant's own policy or an industry standard.  Moyer v. Reynolds, 780 So. 2d 205, 208 (Fla. Dist. Ct. App. 5th 2001).

[85]Dr. Ratner has been a board-certified psychiatrist since 1980, and is licensed to practice psychiatry in Florida, Pennsylvania, and New Mexico.  Dr. Ratner recently moved to Colorado, after having served for seventeen years as an expert witness for the Florida Board of Medicine/Department of Professional Regulation.  He continues to practice, and serves on the Suicidology Committee of the American Academy of Psychiatry and the Law.  Tr. (Ratner) June 30, p. 120.

[86]Dr. Hughes has been a board-certified psychiatrist since 1971, and is actively licensed to practice in Florida.  Dr. Hughes has a clinical practice, but has not had staff privileges to see patients in hospitals for the past ten years.  Tr. (Hughes) July 11, p. 188.

[87]The Florida Legislature imposes several requirements on those individuals seeking to provide expert testimony as to the prevailing professional standard of care in a medical negligence case.  Fla. Stat. § 766.102(5).  The Court has applied both state and federal law to the question of admissibility of these experts' opinions.

## A.  Duty to render a proper diagnosis

Both expert witnesses agreed that the prevailing standard of care for reasonably prudent psychiatrists requires that a psychiatrist complete a thorough evaluation of a patient's current status and history in order to render a proper diagnosis.  Tr. (Ratner) June 29, p. 22, Tr. (Hughes) July 8, pp. 104-105.  Plaintiff's expert testified that, in order to formulate a proper diagnosis and treatment plan, psychiatrists are trained to take the best possible history at a patient's first consultation.  An understanding of the psychiatric patient's history is required to determine if there is a pattern of behavior, and a psychiatrist must look for symptoms and what happened to the patient in the past, in order to have an idea of what might happen to the patient in the future, as "people tend to repeat similar patterns." Tr. (Ratner) June 29, pp. 22, 146.[88]  Defendant's expert acknowledged that Perez's primary mental health care providers, Dr. Manov and Mr. Scheer (at least from January to August 2007), should have been well informed about Perez's extensive medical history and severe mental illness.  Tr. (Hughes) July 8, p. 91, Tr. (Hughes) July 11, p. 111.  The Court concludes that Defendant had a duty to

---

The Court first determined that the experts at least minimally met the requirements of Fla. Stat. § 766.102(5) in order to accept their testimony as to the standard of care, and then applied the standards of Fed. R. Evid. 702 to determine whether the expert's opinions as to causation - or the lack thereof - were admissible, i.e., whether the opinions were based upon sufficient data, and were the product of reliable principles and methods applied reliably to the facts of this case.

[88]Dr. Ratner noted that psychiatrists "are not dealing with listening to hearts or looking in eyes where we could see things material" when rendering a diagnosis. Tr. (Ratner) June 29, p. 22.

thoroughly evaluate Perez's current status and history before rendering a diagnosis.

According to Dr. Ratner, in addition to taking a thorough history at the outset of care, a psychiatrist should conduct a mental status exam each time he sees a patient and Dr. Manov and other VA staff members had a duty to document whether Perez was competent to give answers to questions as to whether he was taking his medications or had any suicidal intent, etc.  Tr. (Ratner) June 29, p. 10, Tr. (Ratner) June 30, pp. 117-119, 126.  Dr. Hughes did not seem to disagree that a psychiatrist should conduct a mental status exam and document a patient's competency, and argued that Dr. Manov had done so when he saw Perez on April 3, 2008, Tr. (Hughes) July 11, pp. 151-155, despite Dr. Manov's own admission that he had not, Tr. (Manov) June 29, pp. 58-59.  Dr. Hughes also testified that "a primary care physician [referring to Nurse Heitman incorrectly as a physician] shouldn't waste her time documenting [mental status] each time unless there's some kind of a reason for it."  Tr. (Hughes) July 11, p. 127.[89]

A psychiatric care provider has a duty to provide a proper diagnosis made after "ascertaining a patient's medical condition through examination and testing," Silva, 601 So. 2d at 1187, and to regularly assess the patient's mental status to

---

[89]The record prepared by Dr. Manov on that date includes a brief entry as to a "mental status exam" which notes: Perez was well groomed, cooperative, alert and oriented, with proper eye contact and motor functioning; his speech was clear and coherent, his thought processes were organized, and he denied hallucinations, but his insight and judgment were poor.  MR 327-328.  In light of Dr. Manov's admission, the Court rejects Dr. Hughes' opinion that a mental status exam was performed to determine whether Perez was competent on that date.

determine whether the patient is at risk.  The Court concludes that this duty applies whether the patient is being seen in a hospital or in an outpatient environment, as it would be peculiar, and seemingly contrary to the intent of Florida's law on medical negligence, to absolve a treating psychiatrist of liability for all negligent acts simply because the patient is being seen on an outpatient basis.[90]

To the extent that the patient continues to receive care from a provider, the duty to render a proper diagnosis is ongoing; however, a provider is not necessarily liable for harm to a patient as a result of an earlier diagnosis when it is clear that psychiatric care has been terminated.  For example, a mental health care provider does not owe a duty to a patient who commits suicide several months after treatment has been completed, where an examination of the patient during care revealed no sign of suicidal tendencies, there was no evidence of prior suicide attempts or threats, and a suicide screening showed no risk of suicide.  Lawlor v. Orlando, 795 So.2d 147 (Fla. Dist. Ct. App. 1st 2001) (affirming grant of summary judgment for psychologist, noting that there was no evidence of suicidal tendencies by decedent during treatment, declining to impose duty on psychologist treating

---

[90]The outpatient status of a person being treated for severe mental illness clearly does not, as a matter of law, completely absolve a psychiatrist or mental health provider from the duty to render an appropriate diagnosis, treatment, and care.  See, e.g., Sweet v. Sheehan, 932 So. 2d 365 (reversing summary judgment for psychiatrist whose patient committed suicide after being treated for nine years as outpatient, with brief period of hospitalization; appellate court noted that claimant's expert had opined that the psychiatrist deviated from the standard of care by failing to appropriately evaluate, treat, and manage the person's severe depression).

client in an outpatient setting).[91]  The facts of the present case demonstrate that the VA continued to provide care to Perez as late as one week prior to his suicide, and had been the exclusive source of Perez's psychiatric care for the final two years of his life.  Unlike the facts in Lawlor, the VA knew that Perez, on at least four separate occasions, had threatened suicide or homicide.

Plaintiff argues that the VA's duty to render a proper diagnosis and to regularly assess Perez's mental competency also required the VA to determine whether Perez needed involuntary hospitalization when he was seen at the Clinic on both occasions in April 2008.[92]  In Florida, a psychiatrist does not have an absolute duty to confine a severely mentally ill person involuntarily; any duty of confinement must be considered in light of the provisions of Fla. Stat. § 394.467.[93]

---

[91]"[I]t is the suicidal tendencies of a specific person - not an undifferentiated knowledge about a group of individuals ... which is determinative of the existence of a duty owed to that person." Kelley v. Beverly Hills Club Apartments, 68 So. 3d 954 (Fla. Dist. Ct. App. 3rd 2011) (finding no liability as to a rental apartment facility which had no control over tenants residing in units leased to a mental health provider).  A court in a sister state has observed that facts such as: decedent "had a history of suicidal proclivities, or manifested suicidal proclivities in the presence of the defendant, or was admitted to the facility of the defendant because of a suicide attempt," arguably render suicide reasonably foreseeable.  Keebler v. Winfield Carraway Hospital, 531 So. 2d 841 (Ala. 1988).

[92]Plaintiff's claim is not based solely on the failure of the VA to seek hospitalization of Perez in April 2008, but also on the VA's allegedly negligent ongoing treatment of Perez's deteriorating mental condition.

[93]The failure to commence proceedings for involuntary placement of a patient trigger does not automatically render a psychiatrist liable to those subsequently injured by the patient; indeed, even after a psychiatrist determines that involuntary placement is warranted, an obligation exists to release a patient if they have been deemed to no longer meet the criteria. See, e.g., Tuten v. Fariborzian, 2012 Fla.

See, e.g., Paddock v. Chacko, 522 So. 2d 410, 415 (Fla. Dist. Ct. App. 5th 1988) (to

impose liability on psychiatrist whom had advised custodial caretaker of suicidal

patient that patient should be hospitalized but whose advice had been refused

"would create an intolerable burden on psychiatrists and the practice of psychiatry;"

doctor had seen patient one time only, four days earlier, and was willing to admit

patient after she provided more detail about her status).[94] Although the experts in

this case disagreed as to whether Perez was subject to involuntary hospitalization

when he was seen at the Clinic on April 3 and again on April 10, 2008, the experts

---

App. LEXIS 355 (Fla. Dist. Ct. App. 1st Feb. 23, 2012) (psychiatrist who treated
patient for several days in a psychiatric facility and initially supported a request for
involuntary placement, then when the patient requested release the doctor certified
that the patient was competent to make such a request, was not liable when patient
shot his wife and himself the next day).

  [94]Similarly, there is no general duty to warn that a patient may be
dangerous, even when the patient has been recently involuntarily committed
pursuant to a Baker Act proceeding.  To determine a psychiatrist's duty to third
party potential victims of their mentally ill patients, Florida courts have noted that
"because the future behavior of a psychiatric patient is unknowable, under Florida
law risk of harm is not foreseeable and therefore no duty exists to lessen the risk or
protect others from the type of risk which a psychiatric patient might pose." Tuten
v. Fariborzian, 2012 Fla. App. LEXIS 355 (Fla. Dist. Ct. App. 1st Feb. 23, 2012).
The psychiatrist in Tuten had been treating the patient for less than ten days at the
time of the suicide.  The doctor had been assigned to the patient on February 5,
2008, while the patient was receiving care at a psychiatric facility.  The doctor
supported a request for involuntary placement filed on February 8, which was
scheduled for hearing seven days later.  Two days prior to the hearing, on February
13, the patient requested release and the doctor certified that the patient was
competent to make such a request.  The next day the patient shot his wife and
himself.  Unlike the facts before the Court as to the VA's history of providing
psychiatric care to Perez, the psychiatrist in Tuten had only briefly provided
psychiatric care for the decedent, and the provisions of the Baker Act controlled the
outcome, i.e., the decision was based on whether the he had breached his duty by
certifying the decedent's competence to request release from inpatient status.

agreed that an assessment of a psychiatric patient must include a determination as to whether the patient presently is at risk of suicide.[95]  Dr. Hughes observed that the VA "apparently has a stipulation that the psychiatrist is to check [whether a patient with chronically severe mental illness is suicidal or homicidal] each time, and I think that's a good idea that the VA has those kind of standards."  Tr. (Hughes), July 8, p. 74.

In summary, the Court concludes that the VA owed Perez a duty to make a proper diagnosis of his condition, based on a thorough assessment of his history and a thorough examination of his condition at the outset of care, with modifications as needed as he continued to be seen by the VA.  The VA also had a duty to evaluate and document whether Perez was competent to provide answers to important questions such as whether he had thoughts of suicide or whether he was taking any psychotropic medications, both at the initial consultation and each time that he was seen for care - particularly in light of Perez's noted delusions and poor judgment and insight.  These duties applied whether Perez was hospitalized or was being seen as an outpatient.  Having made the legal determination that a duty existed for the VA to provide a diagnosis that was rendered after through examination and ongoing testing, the Court now returns to a fact-finding role to determine whether that duty was breached.

_____

[95]A psychiatrist must "do an assessment to see whether suicide is imminently forseeable [sic]."  Tr. (Hughes) July 8, pp. 50-51.

### i. Breach of duty as to diagnosis

The experts disagreed as to whether the VA had breached its duty to provide a proper diagnosis of Perez's mental illness.[96]  Although both experts offered at least a partial key to unlock the mysteries of diagnosing suicidal individuals, the Court found the testimony of Dr. Ratner to be more persuasive, generally, as his testimony was presented with a superior level of current experience as to the relevant issues.  Dr. Ratner's opinions were based on a more rigorous application of the principles of psychiatry to the facts of this case and, as such, the Court finds those opinions to be more reliable than those expressed by Defendant's expert, Dr. Hughes.[97]

───────────────

[96]Medical malpractice cases have been described as "always necessarily a battle of expert witnesses."  Philippon v. Shreffler, 33 So. 3d 704, 707 (Fla. Dist. Ct. App. 4th 2010), citing Lake v. Clark, 533 So. 2d 797, 799 (Fla. Dist. Ct. App. 5th 1988).  As the Supreme Court has observed in an unrelated context, "[p]sychiatry is not ... an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness." Ake v. Oklahoma, 470 U.S. 68, 81, (1985).  In this case, the parties' expert witnesses disagreed "widely and frequently" on whether the VA's conduct fell below the relevant standard of care.

[97]On several occasions, Dr. Hughes appeared to be offering opinions which were not based on sufficiently reliable data and methodology.  For example, Dr. Hughes testified that while he didn't remember what the DSM-IV (a diagnostic manual published by the American Psychiatric Association) stated on the issue, he would disagree with the DSM-IV if it stated that people with persecutory delusions are often violent.  "I don't have the DSM right in front of me.  However, what I can tell you from my understanding of paranoid delusions is that there are lots of people with paranoid delusions who don't attack people."  Tr. (Hughes) July 11, p. 86.  When Dr. Hughes was shown documents he had previously provided to Plaintiff's

### a. Was the VA's diagnosis of Perez based on a thorough review of Perez's history and present condition?

Dr. Ratner gave a detailed explanation of his expert opinion that Dr. Manov failed to review Perez's psychiatric and medical records and therefore was operating with an inadequate history of Perez and, as such, fell below the standard of care. Tr. (Ratner) June 29, pp. 21, 152. Specifically, Dr. Manov did not document any history of Perez that would contribute to what he was seeing each time in terms of patterns of behavior, Tr. (Ratner) June 29, pp. 22-23, and failed to appreciate from the outset (and continuously) that Perez had certain characteristics indicating a significant risk of self-harm.[98]

---

counsel, highlighting that portion of the DSM-IV noting that such persons are often angry and resentful and may resort to violence, he claimed that he had misheard the question when he gave his contradictory answer. Tr. (Hughes) July 11, p. 90.

[98]At trial, Defendant repeatedly objected that portions of Dr. Ratner's testimony were beyond the scope of his expert report. A report was provided to Defendant approximately three months before trial, in compliance with Fed. R. Civ. P. 26, which included a seven page, single-spaced, summary of the basis for the expert's opinions. Defendant elected not to depose Dr. Ratner before trial, but Plaintiff deposed Defendant's expert, Dr. Hughes, who was questioned at length about, e.g., the accuracy of Dr. Manov's diagnosis of Perez's condition. Dr. Ratner testified that his review of Dr. Hughes's deposition testimony resulted in his contradictory opinion as to the proper diagnosis and other issues. While Dr. Ratner's pre-trial report could have been more clearly presented, the substance of his testimony at trial did not significantly differ from his disclosed opinions, nor was there any information considered by Dr. Ratner (other than the subsequently obtained deposition testimony of Defendant's own expert, Dr. Hughes) that was not disclosed in the report. Defense counsel was permitted to cross-examine Dr. Ratner as to each aspect of his opinions and also was permitted further examination as to whether such opinions were specifically stated in the provided report. Defense counsel also questioned her own expert witness extensively as to each opinion which had been offered by Dr. Ratner at trial.   The Court, therefore, overrules any of those objections which were not already overruled at trial, and concludes that

Dr. Manov admitted at trial that, although a patient's history is important, he was not "doing research" into Perez's history to know what his patient had been doing. Tr. (Manov) June 28, pp. 181-183. Dr. Manov also testified that a patient's history "had nothing to do with" a present risk of suicide. Tr. (Manov) June 29, p. 58. Despite the record of Perez's inpatient psychiatric care and prescribed medications being available to Dr. Manov "automatically" through the VA computer system, Dr. Manov apparently did not thoroughly review Perez's record before or during any of his appointments with Perez for psychiatric care. Tr. (Manov) June 28, pp. 181-182, June 29, p. 48; Tr. (Ratner), June 29, pp. 151-152. It appears that Dr. Manov hastily prepared a diagnosis of Perez, relying solely on Perez's delusions which were abundantly evident during his initial consultation, and then never updated his diagnosis.

Dr. Manov testified that he had adequately reviewed Perez's medical records, such that when he saw Perez on April 3, 2008, Dr. Manov was aware of Perez's admission to the VA Hospital with an acute onset of psychosis in February 2006. Tr. (Manov) June 28, p. 169. The Court finds that testimony less than credible, however, as Dr. Manov also testified that he did not know that Perez had been suicidal in February 2006. Dr. Manov testified that he did not know about Perez's elaborate suicide plan, Tr. (Manov) June 28, pp. 182-183, even though it is noted in

---

Defendant was not prejudiced by the introduction of the testimony.

the VA medical records of his hospitalization in December 2006 - January 2007,[99] which should have been reviewed by Dr. Manov before his appointment with Perez on February 6, 2007.[100]

The Court finds that Dr. Manov improperly was of the view that "[w]hatever the patient tells me I know." Tr. (Manov) June 28, p. 182. Dr. Manov asserted that he knew what kind of patient he was treating, and had no duty to look at Perez's history "[i]f he doesn't tell anybody that he was admitted to Memorial [Regional Hospital]." Tr. (Manov) June 28, p. 182. Indeed, Dr. Manov professed that he had been taught that "if you cannot trust what a patient says, it is hard to treat him." Tr. (Manov) June 29, p. 94. Dr. Ratner testified that, while patients do not usually lie, the psychotic condition may cause them to not be truthful about what is really happening. Tr. (Ratner) June 29, p. 148. When the patient is less than candid, reviewing medical records is the "least abrasive" way to get information, and talking with family members is another acceptable approach to gain necessary information. Tr. (Ratner) June 29, pp. 147-149. Dr. Manov did neither.

Dr. Ratner opined that the VA's failure to conduct an adequate assessment of Perez's history and failure to appreciate Perez's present condition resulted in an improper diagnosis at the outset and throughout the period of care. Dr. Ratner

---

[99]Defendant's expert, Dr. Hughes, testified that during that hospital admission Perez's mental health was the worst it had ever been.

[100]Dr. Manov admitted that he did not review the records from Perez's hospitalization in April 2006 at Memorial Regional. Tr. (Manov) June 29, pp. 138-139.

disagreed with Dr. Manov's assessment that Perez had a paranoid delusional disorder, as the accepted definition of that disorder (citing to the DSM-IV, a widely accepted diagnostic manual)[101] includes "nonbizarre" delusions, and Dr. Ratner viewed Perez's delusions about the Catholic church and other matters to be "quite bizarre" and more appropriately indicating a schizophrenic diagnosis.  Tr. (Ratner) June 29, p. 16. Dr. Ratner noted that paranoid delusions are false beliefs that a person cannot be convinced are not true, and that such delusions are a type of psychosis that might be seen in a schizoaffective disorder.  Tr. (Ratner) June 29, p. 16.

Dr. Ratner testified that it appeared that Perez had a schizoaffective disorder, instead of a delusional disorder.[102]  Both expert witnesses described a schizoaffective disorder as a combination of schizophrenia and depression.  Tr. (Ratner) June 29, pp. 14-15; Tr. (Hughes) July 8, p. 78.  Schizophrenia was defined as a psychotic disorder that may have at least two of the following symptoms: delusions, hallucinations, disordered behavior, disordered speech, or apathy.  Tr. (Ratner) June 29, pp. 14-15.  Dr. Hughes acknowledged that schizophrenia - a

---

[101]Both parties' expert witnesses referenced the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV").  The Court has not relied on any statements in that manual, but notes the parties' apparent agreement that it is an accepted reference source.

[102]Defendant objected to admission of this opinion by Dr. Ratner, arguing that it was not in the expert's pre-trial report.  As noted earlier in this Order, the Court overrules this objection, as the report specifically noted that Dr. Manov failed to review Perez's medical records (which referenced that he suffered from a schizoaffective disorder) and incorrectly assessed Perez's symptoms.

"much more serious illness" - was present and that Perez had a schizoaffective

disorder when he was hospitalized in April 2006 at Memorial, but also testified that

Perez did not have schizophrenia.  Tr. (Hughes) July 8, pp. 78, 80, Tr. (Hughes) July

11, pp. 90, 142.[103]  As an expert's self-contradicting testimony is of little assistance

to the Court, the Court rejects the opinion of Dr. Hughes that Perez did not have a

schizoaffective disorder, and accepts Dr. Ratner's opinion that Perez had such a

disorder.

Dr. Ratner described Perez as having a progressively degenerative cerebral

disease; Perez's delusions had appeared relatively suddenly and late in his life,[104]

and the evidence suggested that the onset of his severe psychosis likely was the

result of his HIV infection or another organic cause, or were alcohol-related.[105]  Tr.

---

[103]According to Dr. Hughes, Perez was not diagnosed with a "major depressive disorder," and therefore would not meet the definition of a schizoaffective diagnosis. Tr. (Hughes) July 8, p. 117. This is incorrect, as Perez had been diagnosed with a major depression disorder when he was treated at Memorial Regional Hospital in April 2006. The VA's own records from his first psychiatric hospitalization in February 2006 note that Perez had a history of paranoid schizophrenia. The VA also diagnosed Perez with depression at the time of his discharge from his third psychiatric hospitalization, on January 18, 2007. Dr. Hughes opined that instead of a schizoaffective disorder, Perez had an "encapsulated delusional system that had decompensated"when Perez was hospitalized in January 2007. Tr. (Hughes) July 11, p. 140.

[104]In 2005, Perez complained that taking his HIV medications caused an imbalance to his psyche, and made him feel that his dreams were real. MR 1181 (Nurse Heitman note dated June 9, 2005); MR 1179 (Nurse Heitman note dated Aug. 18, 2005). This may indicate that his delusions were starting at that time.

[105]Dr. Ratner considered Perez to be an alcoholic based on his review of the facts in this case. He also cited a study by Dr. Donald Goodwin, of the National Institute of Mental Health, which found that 75-80% of alcoholics and drug abusers

(Ratner), June 30, pp. 65, 85, 105, 113.  In rendering his expert opinion, Dr. Ratner

stated that he relied on his knowledge of treating patients with organic conditions,

and the evidence-based teaching he had received; he testified that such organic

conditions - involving cerebral problems - do not improve, but only worsen, and

definitely will worsen if not treated.  Tr. (Ratner) June 30, p. 105.  Dr. Hughes

appeared to disagree with Dr. Ratner's assessment of the origin of Perez's psychosis

but his opinion was, again, inconsistent with his own testimony and, as such, is

unreliable.[106]

According to Dr. Manov, he had not realized the extent of Perez's alcoholism

when he first began seeing Perez; he acknowledged that alcohol can induce

delusions, and he stated that each time Perez was Baker-Acted he was in an acute

psychotic state due to his alcohol intake.  Tr. (Manov) June 29, p. 78.  The Court

finds that if Dr. Manov had conducted a more thorough - or any - review of Perez's

medical history, he would have been aware of Perez's alcohol abuse, which was

---

had mood disorders or anxiety disorders.  Tr. (Ratner) June 30, p. 86.  Dr. Hughes
agreed that Perez was addicted to alcohol.  Tr. (Hughes) July 8, p. 56.

[106]Dr. Hughes testified that a thorough neurological assessment in February
2006 had not established that there was an organic basis for Perez's psychosis; the
diagnosis in February 2006 by the VA hospital staff was psychosis "'not otherwise
specified', ... meaning he was psychotic, but they didn't know why."  Tr. (Hughes)
July 8, p. 77; MR 1125.  Dr. Hughes also testified that an organic source was not
ruled out during Perez's hospitalization in January 2007; finally, Dr. Hughes
admitted that Perez's delirium during his hospitalization in July 2007 was the
result of an organic condition that "may well have been alcohol withdrawal."  Tr.
(Hughes) July 8, pp. 68, 78-79.

documented throughout his record of recent hospitalizations,[107] and also was documented in Nurse Heitman's notes as early as September 2006, MR1087.  The Court finds that the failure to have conducted a sufficient review of Perez's history was a breach of Dr. Manov's duty as a psychiatrist.

### b.  Did the VA fulfill its duty to evaluate and document whether Perez was competent each time he was seen for psychiatric care?

Dr. Ratner testified that although the standard of care requires that a competency exam be administered regularly, his assessment of the VA records indicated that there was no documentation that a competency exam was ever administered to Perez.  Tr. (Ratner) June 30, pp. 117-119.  Dr. Manov admitted that he did not do a competency exam on April 3, 2008, Tr. (Manov) June 29, pp. 58-59, but claimed that it was unnecessary.[108]  Dr. Manov recorded that Perez's mood was

---

[107]The evidence demonstrates that at his hospital admission in February 2006, Perez had delusions likely related to HIV/AIDS or alcohol abuse and that he was consuming several beers daily.  When Perez was Baker Acted in April 2006, the record indicates that he admitted that he had been drinking alcohol, and Memorial Regional Hospital described Perez as alcohol dependent.  In December 2006, Perez was admitted to the VA hospital for psychosis secondary to substance abuse.

[108]At trial, Dr. Manov was questioned by Plaintiff's counsel:
> Q: Did you perform any kind of competency exam to determine if this psychotic delusional patient that is talking to you is even competent to be giving his answers to you? Did you perform one of those exams?
> A: It's not a legal term, competency, to give answers to my questions. You know about competency I guess.  Competency to do what, to talk to me?  He was competent to talk to me."

Tr. (Manov) June 29, pp. 58-59.  In response to questions from defense counsel as to whether Perez was competent to make his own decisions, Dr. Manov persisted in his assertion that competency was not relevant to his

not depressed, and that he denied suicidal/homicidal thoughts or plans, but also noted that Perez's emotions were inappropriate, and his insight and judgment were poor. Tr. (Hughes) July 8, pp. 120-121. Although Dr. Manov had never documented that Perez was depressed, he prescribed an antidepressant (Wellbutrin XL) to Perez continuously from May 2006 until early 2008; there also is repeated documentation of Perez's depression and prescribed antidepressant medication elsewhere in the record. Tr. (Ratner) June 29, p. 15.

Dr. Ratner offered his opinion that the brief observations noted by Dr. Manov on April 3 may have addressed whether Perez was depressed, but the record did not reveal that an adequate evaluation of the risk of suicide was performed. Tr. (Ratner) June 30, p. 131. Dr. Ratner also testified that it was a breach of the standard of care for the VA staff to have failed to conduct a suicide screening on April 10, 2008, Tr. (Ratner) June 30, p. 79. This breach is particularly notable because the evidence clearly demonstrates that the VA staff knew that Perez was receiving no psychotropic medications at that time. The Court agrees with Dr. Ratner and finds that it was a deviation from the standard of care for the VA to have not conducted a more thorough evaluation of Perez's risk of suicide when he was seen at the Clinic on April 3, and it was also a deviation for the VA staff to

---

assessment of Perez.
> Q: Was Mr. Perez ever incapacitated or incompetent during the time you were treating him, to your knowledge? ...
> A. No, never. He was never declared incompetent by any legal body. It never came up."
Tr. (Manov) June 29, p. 130.

have not conducted a suicide screening and adequate evaluation when Perez was at the Clinic on April 10.

According to Dr. Ratner, Perez continued to have several risk factors for suicide when he was last seen by Dr. Manov on April 3, 2008; at that time Perez was: male, Hispanic,[109] unemployed, socially isolated, psychotic, possibly cognitively impaired, had a physical illness, and also had a history of suicidal ideation. Tr. (Ratner) June 30, p. 131. These conditions had not improved since Perez's hospitalizations in 2007, as Perez's judgment in April 2008 was still impaired, he was still psychotic, and he had not received adequate treatment for his mental illness. Tr. (Ratner) June 30, p. 132. The Court agrees with Dr. Ratner's assessment that Perez had several risk factors for suicide in April 2008, and finds that the VA deviated from the standard of care when it failed to properly assess Perez's condition each time he was seen the VA, and modify the diagnosis as needed.

Dr. Ratner testified that Perez was in such a severely compromised mental state on both April 3 and again on April 10 that he would have been subject to involuntary confinement pursuant to the Baker Act. Tr. (Ratner) June 30, pp. 80-81. Dr. Hughes disagreed, noting that, while Perez's past history "should make someone somewhat cautious because he had suicidal ideations and homicidal ideations," Perez had not made any suicide attempts and did not have a clear intent

---

[109]Dr. Ratner testified that Hispanics commit suicide more frequently than other cultural groups. Tr. (Ratner) June 30, p. 131.

to do so, and at the time of the Clinic visits in April there was no indication that he needed to be hospitalized, despite the return of the delusions. Tr. (Hughes) July 8, pp. 140-141, Tr. (Hughes) July 11, p. 7.[110]  Dr. Hughes noted that Dr. Manov never found Perez to be depressed, and that even though others had described Perez to be depressed at times, "nobody gave him the diagnosis of a major depressive disorder." Tr. (Hughes) July 8, p. 80.  This is incorrect, as Perez had been diagnosed with a major depression disorder during his hospitalization in April 2006 at Memorial Regional Hospital.  There is sufficient evidence in the record to establish that Perez suffered from depression and severe mental illness - including persecutory delusions, and the Court finds that when Perez visited the VA in April 2008, VA staff should have done a more comprehensive assessment of his mental health in order to determine whether hospitalization was warranted, and the failure to do so constituted a breach in the standard of care.

Dr. Ratner also opined that it would have been reasonable, and legally permissible, for the VA to contact Perez's family in April 2008 to seek additional information or to provide support for Perez. Tr. (Ratner) June 30, p. 81.  The Court agrees with this opinion.  Although Perez and his wife had divorced several months earlier, it was undisputed that the divorce was precipitated by the delusions and

---

[110]Dr. Hughes testified that no one was seeing Perez in April 2008, so "we don't know what his condition was" and "perhaps had they seen him at that time that he was deciding to take his life, that might be another issue." Tr. (Hughes) July 11, p. 14.  Defendant's own expert witness seemed to imply that Plaintiff should have been seen by Defendant for additional mental health care in April 2008.

that the wife remained active in Perez's life; the VA also should have been able to locate Perez's daughter, if necessary.

In summary, the Court finds that Dr. Manov and the VA breached their duty of care by not taking a complete and accurate history of Perez during his initial consultation or at any time thereafter while he was receiving care on an outpatient basis. Nor did the VA meet the standard of care as to rendering a diagnosis based on examination and testing; indeed, there is no indication that Dr. Manov ever made a diagnosis as to the sudden onset of Perez's delusions and psychosis at the age of fifty-three without a prior history of mental illness. The VA had specific evidence of Perez's suicidal and homicidal ideation during four prior hospital admissions[111] in the two years before his death and should have taken into account that Perez had such severe psychosis and hallucinations while hospitalized in July 2007 that he required a 1:1 sitter for several days. The fact that Perez reportedly did not express suicidal ideation to Nurse Heitman or Dr. Manov when Perez visited the Clinic twice in April 2008 - as late as one week prior to his suicide - is not determinative on this issue, particularly in light of his delusional state and poor judgment which were recorded by the VA during those visits.

Moreover, it was a breach of the standard of care to not conduct a competency exam or to assess Perez's mental status in greater detail during his visits to the Clinic in April 2008, particularly in light of his noted poor insight, as well as the

---

[111]As three of those hospitalizations were at the VA's own hospital, the records were easily accessible.

fact that he was not currently on any psychotropic medications, and had not been seen by any mental health care provider for an extended period of time. In brief, Dr. Manov, as the VA's assigned treating psychiatrist, and the VA, as the exclusive provider of mental health care during the last two years of Perez's life, knew or should have known that Perez was at a high risk for suicide. With such knowledge, a reasonably prudent provider of psychiatric care had a duty to take reasonable steps to try to prevent a patient's suicide. The VA should have developed an adequate diagnosis (taking into account Perez's history and current conditions or risk factors) and should have regularly evaluated his mental status, including in April 2008. The VA's failure to do so was a deviation from the standard of care. The facts before the Court establish, by the greater weight of the evidence, that by failing to treat Perez at the prevailing standard of care, the VA breached its duty.

### ii. Did the VA's breach of duty as to diagnosis proximately cause Perez's suicide?

Dr. Manov conducted apparently little - if any - review of Perez's record of recent and ongoing psychiatric hospitalizations while Perez was his patient. The VA's failure to adequately evaluate Perez's history resulted in an improper diagnosis (and consequent treatment approach) - which is of particularly grave concern when a patient is being treated as an outpatient. A psychiatrist has less ability to monitor the progress of a patient being treated outside of an institutional setting and errors of judgment in the diagnosis are left to be discovered while the

75

patient is struggling on their own without the attendant protections of hospital staff. In this case, the VA's failure to render a proper diagnosis may have resulted in the deterioration of Perez's mental health to a point where he could not control his suicidal impulses.[112] If Perez had been properly diagnosed before his mental condition deteriorated, he could have been offered alternatives, including a return to the MHICM program, a follow up appointment with a psychiatrist or other VA medical staff in the next few days or the following week, a long-acting injection of an antipsychotic drug, etc.[113] If Perez declined all of these options, the VA staff then could have considered the possibility of a petition for involuntarily confinement. Tr. (Ratner) June 29, p. 21, Tr. (Ratner) June 30, pp. 136-137.

The expert witnesses agreed that psychiatrists often cannot predict suicide any more accurately than the average person. Tr. (Hughes) July 11, p. 30, Tr. (Ratner) June 30, p. 120. Dr. Ratner testified, however, that there are specific issues related to suicidal tendencies that psychiatrists are trained to evaluate, and

———————————————

[112]Conceivably, a decedent's final act of suicide could be viewed as an intervening cause that disrupts the proximate cause analysis, but when the alleged tortfeasor's negligence caused the decedent to become so incompetent that he was unable to control himself from taking his own life, the final act is not an intervening cause.

[113]During Perez's hospitalization in January 2007, a VA physician had noted that an injection of an antipsychotic had been ordered for Perez so that he "will not decompensate due to non-compliance with oral medications." MR 954-955. The record is silent as to any acceptable reason why the VA failed to, at minimum, ask Perez if he would accept a similar injection when he visited the Clinic in April 2008. The VA is not relieved of its duty to provide care for delusional patients simply by Dr. Manov's assertion that "paranoid people don't like shots" - moreover, his statement is not supported by any evidence.

76

a series of factors that would make a person more vulnerable to suicide. Dr. Ratner referenced a study, published in Psychiatric News, which found that one-third of people who have previous suicidal ideation will kill themselves within one year. Tr. (Ratner) June 30, pp. 111. Thus, reasonably prudent psychiatrists recognize that patients whom have had suicidal ideation within the past year must be considered as having a great risk of suicide. A prior suicidal ideation is not necessarily present in all patients who commit suicide, however; Dr. Ratner cited to an evidence-based study by Dr. Jan Faucet, finding that 70% of people who committed suicide previously had denied suicidal ideation.

Dr. Hughes testified that while suicidal ideation is somewhat common in the United States, the number of actual suicides is very low. Tr. (Hughes) July 11, p. 11. According to Dr. Hughes, a psychiatrist must ask a series of questions to determine the patient's level of suicidal ideations, as well as assess the patient's feelings through empathy and physical presence.[114] Tr. (Hughes) July 8, p. 126. According to Dr. Hughes, a particularly empathic mental health care provider would be able to "feel" the patient's intent to commit suicide, although Dr. Hughes later testified that the "literature, including the guidelines for the assessment and

---

[114]"You have to have the capacity to empathize with them, to feel what they are feeling.... When somebody has the intention to commit suicide, if you are paying attention to it, you can feel that and you can see it and you can observe it in the way they look, the way their face is drawn, the tone of their voice, the sagging of their body. It is not just the words, it's the music, too. All of those things are used in assessing suicide and, particularly, suicidal intent." Tr. (Hughes) July 8, pp. 126-127.

treatment of suicidal potential from the American Psychiatric Association" states that even with the best assessment of all the available risk factors, it is not possible to predict suicide.  Tr. (Hughes) July 11, p. 11.

While the greater weight of the evidence demonstrated that the VA rendered psychiatric care that fell below the prevailing standard as to the rendering of a proper diagnosis, the Court does not find that the misdiagnosis of Perez as having a delusional disorder instead of a schizoaffective disorder was the proximate cause of Perez's suicide.  Indeed, Plaintiff's expert did not offer a conclusive opinion that the VA's hastily prepared and improperly supported diagnosis was the proximate cause of Perez's suicide.[115]  Clearly, this breach of the VA's duty significantly contributed to the overall negligence in the psychiatric care it rendered to Perez, but the Court finds that this breach of duty was not the proximate cause Perez's death.

The question is much closer, however, as to the VA's failure to conduct a regular evaluation of Perez's mental status and, specifically, to conduct a competency exam or to assess his mental status in greater detail during his visits to the Clinic in April 2008.  The evidence established that VA staff knew in April 2008 that Perez was not currently on any psychotropic medications, and that the VA had not renewed Perez's prescriptions for such medications at any time in the past eight

---

[115]According to Dr. Ratner, the VA was heading in the right direction with its diagnosis of Perez, but the prescribed Wellbutrin XL could have been making Perez's symptoms worse, as Wellbutrin XL has the possibility of contributing to the delusional system and aggravating psychotic thinking, or could lead to suicidal ideation.  Tr. (Ratner) June 29, p. 153, Tr. (Ratner) June 30, pp. 85, 87.

months, and that he had not been seen by any mental health care provider for an extended period of time prior to arriving at the Clinic on April 3; despite this knowledge, Perez was sent home with instructions to return for psychiatric care in six months.

If the VA had more carefully assessed Perez's competency on April 3, it would have been evident that Perez's statements that he was not suicidal and had no intent to harm himself were inconsistent with his condition. Similarly, if the VA staff had more carefully evaluated Perez on April 10, they might have referred him for a psychiatric evaluation and treatment - at which time he might have been persuaded to accept a long-acting injection of Risperidone, or some other medication while at the Clinic, in an effort to stabilize his condition. The Clinic staff should have realized that Perez's unusual candor about his excessive alcohol intake the prior night indicated that he was at risk, and in need of psychiatric care urgently; his recent alcohol abuse also should have indicated to the staff a need to question his competency that day. If the VA had more carefully evaluated Perez's risks, the VA might have persuaded him to consider a brief period of hospitalization, or at least to allow the VA to speak with his family members about his care.[116] The Court has determined that the VA's failure to conduct a competency exam on April 3, and the VA's failure to assess Perez's mental status (or even to conduct a suicide

---

[116]As previously stated, the VA could have taken the reasonable step of contacting Perez's family members to more fully assess whether Perez was accurately reporting that he was not at risk for suicide.

screening) on April 10 - the last time Perez was seen by the VA before his suicide the following week - more likely than not caused Perez's death by suicide one week later.

## B.  Duty as to treatment and care

In general, a health care provider fulfills the duty to their patient by "prescribing and administering a course of action to effect a cure, and meeting the patient's daily needs during the illness." Silva, 601 So. 2d at 1187.  The specific aspects of a psychiatric care provider's duty depend, in part, upon the duration or extent of the provider's relationship to the patient receiving treatment and care.

A longer period of care or a more extensive relationship implies that the provider has (or should have) greater knowledge of a patient's specific psychiatric status and suicidal intentions and can better prescribe and administer a course of action, as well as meet the patient's needs; a failure to render proper treatment and care in such circumstances may result in liability for the provider.  For example, liability exists for negligent care rendered to patients being treated in a psychiatric facility due to the provider's relatively extensive ability to supervise and control the patient.  See, e.g., Brown v. Kaufman, 792 So. 2d 502, 503 (Fla. Dist. Ct. App. 4th 2001) (reversing directed verdict in favor of psychiatrist who was also supervisor of hospital unit in which patient was left unattended in violation of fifteen-minute suicide check policy); Reid v. Altieri, 950 So. 2d 518 (Fla. Dist. Ct. App. 4th 2007) (noting that jury found hospital and psychiatrist responsible for suicide of person

80

treated briefly as inpatient).  Liability also may exist in the outpatient setting when a psychiatrist treats a patient for several years during which that patient repeatedly expressed a suicidal intent.  See, e.g., Sweet, 932 So. 2d 365 (duty may exist where psychiatric treatment had continued for nine years); see also, Lawlor 795 So. 2d at 149 dissenting opinion (noting that Lawlor's expert's opinion - ignored by majority in finding no liability as to outpatient care - stated that the psychologist who treated a patient for seven years and without an appropriate treatment plan caused a deteriorating mental condition, untreated depression, and corresponding sense of hopelessness that may have rendered psychologist liable for patient's suicide).  A psychiatrist also might find that after treating a patient for a long period of time the patient becomes dependent on that care and, as a result, the psychiatrist's duty to meet that patient's needs may be greater.[117]

In contrast, a treating relationship of only a short time period, or treatment for a medical issue without any obvious psychiatric aspects, may not be sufficiently developed such that the health care provider is able to gain adequate insight as to the patient and, consequently, the provider may not necessarily be liable for failing to provide appropriate psychiatric treatment and care.  See, e.g., Garcia v. Lifemark Hospitals of Florida, 754 So. 2d 48, 49 (Fla. Dist. Ct. App. 3rd 1999) (treating a

_____

[117]As explained by the Supreme Court of Florida, "the greater the risk of harm to others that is created by a person's chosen activity, the greater the burden or duty to avoid injury to others becomes."  United States v. Stevens, 994 So. 2d 1062, 1067 (Fla. 2008) (answering a question certified by federal appellate court, holding that a laboratory dealing with ultra-hazardous materials owes a duty of reasonable care to the general public).

patient in an emergency room setting "does not lend itself to the establishment of a close, personal relationship between physician and patient" and emergency department physicians were not liable for failure to diagnose suicidal tendencies in patient who committed suicide after discharge from hospital; doctors do not have a duty to treat patients "for every conceivable medical condition that they might have").

The evidence in this case clearly established that the VA was the sole[118] provider of psychiatric care to Perez since the beginning of his delusional descent in early 2006, and that Dr. Manov was the only psychiatrist treating Perez at the time of his suicide, and had been the only psychiatrist outside of a hospital setting to treat Perez in the two years prior to his death.[119]  Defendant's own expert witness testified that Dr. Manov, as the treating psychiatrist, owed Perez a duty to "monitor his level of health and illness [and] monitor the man to see how he was doing so that he could manage his medications," and determine whether Perez needed more

─────────────────────

[118]The only exception was a brief emergency admission for inpatient psychiatric care from April 7-11, 2006, when local law enforcement transported Perez to a nearby hospital, Memorial Regional.

[119]Dr. Manov testified that he believed that another psychiatrist was adjusting Perez's medications and providing treatment for Perez for the approximately fourteen months between Dr. Manov's last appointment with Perez in February 2007 and when he saw Perez at the Clinic on April 3, 2008, Tr. (Manov) June 28, pp. 161-162, June 29, pp. 38-39.  No evidence was introduced to indicate that there was a good faith basis for this belief and the testimony is, therefore, rejected as lacking credibility.  The only other psychiatrists who rendered care to Perez in the two years before his death did so in hospital-based settings: February 16-19, 2006 (VA), April 7-11, 2006 (Memorial Regional), December 30, 2006 - January 18, 2007 (VA), and July 9 - August 6, 2007 (VA).

care.  Tr. (Hughes) July 8, pp. 110, 141.  Defendant's expert also opined that Dr. Manov had a duty to manage Perez's delusions with appropriate medication.[120]  Tr. (Hughes) July 8, pp. 91-92.

Plaintiff's expert, Dr. Ratner, agreed with the defense expert's opinions, and added that Dr. Manov had the duty to closely monitor Perez's medications, particularly starting in May 2006 when Dr. Manov had substantially increased Perez's prescribed dosage of the antipsychotic medication Abilify (which had been prescribed to Perez for the first time by the physicians at Memorial Regional Hospital during Perez's hospitalization the prior month).  Tr. (Ratner) June 30, pp. 51-52.  Dr. Ratner also testified that Dr. Manov had a duty to monitor the interactions and side effects of medications closely after Perez's appointment n February 2007, as Perez was on many medications - some of which he had only been taking for a short time while recently hospitalized, and that this duty was particularly important in light of Perez's poor judgment.  Tr. (Ratner) June 30, pp. 56-57.

---

[120]At one point in his testimony, Defendant's expert, Dr. Hughes, claimed that Dr. Manov was merely a medicine manager for Perez; Dr. Hughes then offered criticism of the health insurance industry, complaining that insurance companies have dictated the standard of care for medication management by rejecting reimbursement claims in excess of fifteen minutes for such care. Tr. (Hughes) July 8, p. 111.  The Court disregards this opinion as contradicted by Dr. Hughes's own testimony that Dr. Manov was Perez's primary mental health care provider and had more extensive duties than only managing Perez's medications.  The opinion also appears to be of little relevance to this case, and contradicts Dr. Manov's testimony that insurance will pay for a thirty minute session with each patient, Tr. (Manov) June 28, p. 161.

Dr. Manov acknowledged that he had a duty whenever he saw a patient to adjust[121] and monitor a patient's medications, and that it was important to know what medications the patient was taking and to see if the patient was having any side effects.  Tr. (Manov) June 28, p. 177.[122]  Based on the experts' agreement and Dr. Manov's concession, the Court concludes that the VA had a duty to monitor Perez's health and manage his delusions with appropriate medications, and also had a duty to closely monitor the effectiveness of the dosages being prescribed, particularly when those dosages were being increased and also when new medications were being added.

Both experts discussed the importance of adequately evaluating a psychiatric patient, through regular monitoring, and testified as to the importance of a mental health care provider developing a relationship of trust with a patient, i.e., such that the patient trusts the provider;[123] the witnesses observed that this is particularly

---

[121]At trial, both Nurse Heitman and Nurse Fogarty confirmed that the treating psychiatrist would have been the person who could change Perez's prescribed medications while he was in outpatient care.  Tr. (Heitman) July 7, pp. 107-108, 111; Tr. (Fogarty) July 8, pp. 3-4.

[122]Dr. Hughes testified that while Mr. Scheer and Dr. Manov were the primary mental health care providers for Perez, Nurse Heitman - in her role as a primary health care provider - was also responsible for monitoring, as needed, the psychotropic medications prescribed to Perez.  Tr. (Hughes) July 11, pp. 111, 116-117, 119, 127.  The Court does not agree that Nurse Heitman was responsible for monitoring Perez's psychotropic medications to the extent of making adjustments to those prescriptions (which she is not qualified to do), but accepts Dr. Hughes' opinion as it recognizes the general duty of the VA to monitor Perez's medications.

[123]Dr. Manov testified that Perez trusted him, Tr. (Manov) June 29, p. 87, and Dr. Hughes testified that Perez also trusted the VA, Tr. (Hughes) July 8, pp. 54, 72,

challenging when the patient suffers, as did Perez, from paranoid delusions.  Tr. (Ratner) June 29, pp. 147, 149; Tr. (Hughes) July 8, pp. 125, 136, 138, July 11, pp. 4-5.  Plaintiff's expert, Dr. Ratner, noted that a good therapeutic relationship requires that the patient trust the psychiatrist and that the "most important thing is to be empathetic, ... supportive, caring." Tr. (Ratner) June 29, pp. 149-151. Scheduling and maintaining regular appointments with a patient clearly is an acceptable method of monitoring the patient's mental health, and also may assist a provider in developing a trusting relationship with the psychiatric patient.

According to VA policies which were effective as of October 11, 2006, the responsible health care provider has a duty, when a patient misses an appointment, to review the patient's record and "determine and initiate appropriate follow-up action."  Plaintiff's Ex. 11 (VHA Directive 2006-055).  When the VA cancelled an appointment, the provider was required to review the record of the patient, "ensure that urgent medical problems are addressed in a timely fashion, ensure that provisions are made for necessary medication renewals, and ensure that patients are rescheduled to be seen on a clinically-appropriate basis."  Id.[124]

In summary, although psychiatric care providers are not burdened with an absolute duty to prevent suicide by their patients, the Court concludes that such

---

75, 125.

[124]While Plaintiff has identified numerous examples of the VA's failure to comply with its own directives and policies, the Court generally has not relied on those directives and policies as statements of the applicable standard of care.

providers have a duty to not act with such negligence in their treatment that their acts or omissions would proximately cause harm to a patient. The record before the Court in this case compels a conclusion that the VA owed Perez a duty to prescribe and administer a course of action designed to treat his severe mental illness such that Perez reasonably might survive that illness. That treatment should have included regular monitoring of Perez's mental health, and close monitoring and necessary adjustments of the medications being prescribed to treat his illness and manage his persecutory delusions. The fact that Perez was seen on an outpatient basis by the VA at the time of his suicide does not negate the duty owed to Perez to regularly monitor his mental health. Specifically, the VA knew, or should have known, of Perez's history of suicidal ideation and depression and, in light of that knowledge, had a duty to take reasonable steps to try to prevent Perez's suicide, e.g., schedule appointments regularly (with follow-up after any cancellations), confirm that prescribed medications were being obtained or - at a minimum - that renewals/refills were available, properly monitor and adjust the medications being prescribed to treat Perez's severe mental illness - including reviewing for any side effects or interactions with other medications, and ensure that appointments were scheduled regularly to assess whether Perez needed additional care. Having determined, as a matter of law, that the VA owed Perez this duty, the Court now must make factual findings as to whether the VA breached that duty to provide proper treatment and care to Perez.

### i. Breach of duty as to treatment and care

The Court begins its analysis by rejecting Defendant's implied argument that Perez was noncompliant with his appointments and that his noncompliance absolved the VA of its duty to provide appropriate treatment and care. Dr. Hughes claimed that the VA was unable to get Perez to "come in when they wanted" and that Perez was "that kind of a guy" who would only come to the VA when he wanted. The Court finds to the contrary, i.e., the Court finds that Perez attended the overwhelming majority of appointments scheduled for him with other VA medical staff, made the initial request for an appointment with a VA psychiatrist, met with Dr. Manov shortly after each of Perez's three psychiatric hospitalizations, and attended each appointment scheduled with Dr. Manov other than one which was canceled and not rescheduled by the VA.[125] Defendant simply has failed to establish that Perez was generally noncompliant with VA appointments for psychiatric, or medical, care; instead, the record establishes that the VA failed to meet its duty in a number of ways.

### a. Did the VA breach its duty to regularly monitor Perez's mental health?

It was undisputed that the VA failed to reschedule an appointment for Perez when the VA cancelled his appointment for March 2006, and failed to schedule any

---

[125]Perez also had participated in research studies and clinical trials at the VA in the 1990s. Plaintiff's Ex. 5, Perez 2RFP 000006.

appointment after February 2007.[126]  Dr. Ratner testified that there was a failure in

the VA's system of scheduling Perez's appointments for psychiatric care, and that

Dr. Manov also failed in his duty, and fell below the standard of care in the

community, to ensure that Perez was seen regularly.  Tr. (Ratner) June 30, p. 18.

Dr. Manov testified at trial that he had nothing to do with scheduling

patients' appointments, and simply saw those patients each day whom appeared at

his office.  (Dr. Manov testified that he had no advance notice of when patients were

scheduled for appointments with him, and that staff would simply tell him when a

patient arrived.)  Tr. (Manov) June 28, pp. 160-161, 174.  According to Dr. Manov,

when he asked VA staff to schedule patients for appointments, he was told that

there were no openings.  Tr. (Manov) June 29, pp. 35-36.  As discussed above, the

VA failed to ensure that Perez was seen regularly; indeed, Perez was left without

psychiatric care appointments for months at a time.  The Court finds that the VA

breached its duty to Perez to see him regularly for treatment and care.

At trial, Dr. Manov testified that he was ready and available to help Perez

and that any patient who appeared at his office without an appointment would be

seen and treated; as evidence of this practice the Court notes that Nurse Heitman

was able to schedule a prompt consult for Perez with Dr. Manov on April 3, 2008,

without a prior appointment.  The Court does not doubt Dr. Manov's intentions to

provide care to his patients, but Dr. Manov admitted that in July 2007 he was

---

[126]The record indicates that the VA may have attempted to schedule an
appointment in July - August 2007, but never completed the task.

seeing sixteen patients daily and was responsible for a total of eight hundred patients. Based on that schedule, the VA had made it impossible for Dr. Manov to see even one-half of those patients on a monthly basis.

Even if there had been available time in Dr. Manov's busy calendar to schedule a monthly appointment for Perez, Dr. Manov claimed to "know" Perez and his needs after just his first two appointments, and therefore believed that he did not need to see Perez every month thereafter to provide treatment. Tr. (Manov) June 29, p. 31. Dr. Manov testified that six months between appointments was routine, and "what would be the point in seeing [Perez] every month." Tr. (Manov) June 29, p. 7, June 28, p. 42. Earlier in his testimony, Dr. Manov claimed that one month for follow up appointments was standard at the VA, Tr. (Manov) June 28, pp. 30, 35, but he later changed his position and said that he only recommended follow up appointments in one month for new patients. Tr. (Manov) June 28, p. 185. The record contradicts his testimony, as he recommend a follow up in one month after each of Perez's first three appointments. Dr. Manov said that he did not make any attempt to reschedule any cancelled appointments with Perez, and said that it would be "crazy for me to do, to call a patient at home," Tr. (Manov) June 29, p. 52; this appears to be a breach of the VA's own policy that a provider must "initiate appropriate follow-up action" when a patient misses an appointment, and "ensure that provisions are made for necessary medication renewals" when the VA cancelled an appointment.

The Court concludes that the VA's failure to schedule and maintain regular

appointments for Perez to receive psychiatric care was a breach of the VA's duty to regularly monitor Perez's health.  The lack of regular appointments with Perez also rendered the VA unable to monitor the effectiveness of the dosages of psychotropic medications being prescribed.

### b.  Did the VA breach its duty to closely monitor and adjust the psychotropic medications prescribed to Perez to treat his illness?

Dr. Ratner specifically opined that it was a clear deviation from the standard of care as to medication monitoring to wait seven months to see a patient after prescribing the medications Dr. Manov had prescribed to Perez in May 2006.  Tr. (Ratner) June 30, p. 53.  Dr. Ratner testified that Wellbutrin XL, first prescribed for Perez in April 2006 by Memorial Regional Hospital and then prescribed by Dr. Manov again the following month, can make a patient anxious or lead to suicidal ideation, and that more frequent appointments should have been scheduled with Perez to monitor his reactions to the medications, evaluate whether Perez was having side effects, and determine the effectiveness of the Wellbutrin XL prescribed to Perez.  Tr. (Ratner) June 29, p. 153.

Dr. Ratner also testified that it was a breach of the standard of care to wait six months for a follow up appointment after Dr. Manov had renewed multiple medications at an appointment with Perez on February 6, 2007, Tr. (Ratner) June

30, pp. 56-57.[127] And, finally, Dr. Ratner opined that Dr. Manov should have planned for a follow up appointment with Perez sooner than six months after he was seen in April 2008, as Dr. Manov had restarted Perez on Risperidone[128] and should have been monitoring Perez for side effects.   According to Dr. Ratner, Risperidone can cause restless leg movement in the first weeks, or panic attacks, and also can worsen psychosis.[129] The Court finds that a reasonably prudent psychiatrist would not dismiss a patient with instructions to return in six months under the circumstances presented by Perez in May 2006, February 2007, and April 2008.[130] Psychiatric care providers, and health care providers generally, must monitor for side effects and drug interactions.

Importantly, after August 30, 2007 (when he was discharged from MHICM),

---

[127]Although Dr. Manov had dosed Perez heavily in February 2007, repeating the exact medications that had been prescribed to Perez during his hospitalization the prior month, and sent him home with active prescriptions for an antidepressant, an anti-anxiety medication, and three antipsychotic medications (including two which were prescribed twice, in different dosages), Dr. Manov never scheduled Perez for another appointment.

[128]Dr. Manov recorded that he was prescribing Risperidone, but he did not do so; Perez did, however, have an existing prescription with one refill available.

[129]Dr. Ratner referenced his clinical experience and recorded instances in the relevant literature indicating that some patients had committed suicide as a result of the side effect of the persistent restless leg movements.  Tr. (Ratner) June 29, p. 153.

[130]The Court also notes that Perez had been discharged from the VA hospital several months earlier, on August 6, 2007, without any appointment being scheduled by the VA for a psychiatric follow-up, even though Perez still had active prescriptions (with available refills) for an antidepressant, an anti-anxiety medication, and two antipsychotic medications (including Risperidone).

Perez only had remaining prescriptions for an antidepressant and one antipsychotic (Risperidone); the other prescriptions all had expired or had no refills remaining.  In effect, during the last eight months of his life, Perez was not receiving any antipsychotic or anti-anxiety medications, and had insufficient refills available of an antidepressant medication and a single antipsychotic medication.  When Dr. Manov saw Perez on April 3, 2008, he decided that Perez was already receiving "needed treatment." Although Perez was not taking his sole prescribed psychotropic medication (Risperidone), and was still quite delusional, and had an inappropriate affect and little insight, Dr. Manov said that everything was going "the way it was supposed to go." The VA knew or should have known that Perez was not receiving medication at this time and should have provided him with appropriate treatment, including medication to manage his delusions; it was a breach of duty for the VA not to have taken further steps to evaluate Perez in April 2008 and not to have monitored the status of his prescriptions more closely.

Although Perez had a history of non-compliance with his HIV-related prescribed medications, the greater weight of the evidence establishes that Perez was compliant with other medications, e.g., the Clonazepam and Temazepam, and the VA is not excused from its duty by suggesting that Perez was generally non-compliant with prescribed medications.  It was a breach of the standard of care for the VA to not have at least verified whether Perez was obtaining his prescribed medications throughout 2006 and 2007 - if the VA had done so, it would have been evident that Perez was not truthful when he reportedly stated, at his appointments

92

with Dr. Manov, that he was taking all of his medications.  It also was a breach of the standard of care to have failed to confirm the accuracy of this information when Perez was seen at the Clinic in April 2008.

Dr. Manov testified that he took Perez's statements about his medications at "face value," Tr. (Manov) June 29, p. 45, which is an unacceptable deviation from the standard of care for a psychiatrist with easy access to computerized records - from which at least a quick review could be conducted as to whether the patient had received the prescribed medications.  According to Dr. Ratner, patients usually do not lie but they may distort; if a patient is forgetful or has impaired judgment, then a medical professional might ask a family member who lives with them, or might perform a blood test.  As an initial matter, it should be checked to see if the patient is refilling their prescriptions; a quick review would have revealed that Perez was not.  In the final analysis, according to Dr. Ratner, blood tests are the only way to determine accurately whether a patient is taking medications; Dr. Ratner opined that while Nurse Heitman was drawing blood samples for other medical tests, she could have asked Perez's permission to do a serum test (which would have revealed the presence of medications).  Tr. (Ratner) June 30, pp. 144-145.

In summary, on three occasions the VA sent Perez home with new prescriptions for psychotropic medications (often at increased dosages from his recent prescription) and no appointment for monitoring the effects of these medications for the next six months or longer.  The Court rejects Dr. Hughes's opinion that these long periods of time between appointments met the standard of

93

care for monitoring of Perez's condition,[131] and adopts the opinion of Dr. Ratner that it was a breach of the standard of care for the VA to have not scheduled and maintained appointments more frequently to monitor and adjust medications which had been prescribed to treat Perez's mental illness.

### c. Did the VA breach its duty to manage Perez's persecutory delusions with proper treatment and care?

At each appointment with Perez, including the first appointment, Dr. Manov appears to have simply adopted the prescriptions entered by whichever hospital physicians had most recently seen Perez,[132] without documenting an analysis of the medications' effectiveness.[133] The VA's records demonstrate that Dr. Manov adopted each new round of prescriptions without discontinuing Perez's earlier prescribed medications, or at least noting that all medications were compatible,

---

[131]Although Dr. Hughes did not acknowledge that it was a breach of the standard of care for Dr. Manov to have recommended that Perez wait six months between appointments, Dr. Hughes testified repeatedly that it "would have been nice" if Dr. Manov had scheduled an appointment with Perez for a time sooner than six months from the date of his visit to the Clinic on April 3, 2008.  Tr. (Hughes) July 8, pp. 130-131.

[132]For example, in February 2006, Dr. Manov adopted the prescription of Seroquel prescribed the prior week during Perez's hospitalization; in April 2006, he prescribed Wellbutrin XL and Abilify, as had been prescribed the week before at Memorial Regional Hospital; and in February 2007 he prescribed Risperidone which had been prescribed the prior month while Perez was hospitalized.

[133]Dr. Manov's recorded statement that Perez was doing "somewhat better" after being prescribed Abilify and Wellbutrin XL, is insufficient evidence that Dr. Manov applied his scientific knowledge to the benefit of Perez in determining the proper medication and its dosage.

such that Perez had a growing number of prescriptions for psychotropic medications without any meaningful evaluation of their combined effectiveness for Perez's condition.[134]

Of even greater concern is the fact that at three of the four appointments with Perez, Dr. Manov increased the prescribed dosage of a medication recently provided to Perez, and did so without any documentation as to the reason for the increase. For example, Dr. Ratner testified that it was a breach of the standard of care for Dr. Manov to have prescribed such a large increase in the dosage of Abilify (to 60 mg daily, i.e., double the standard dosage of 30 mg) because of potentially very serious side effects of that medication, including toxicity, and that it also was a breach of the standard of care for Dr. Manov to not see Perez within a short time in order to determine whether he was experiencing any interactions or side effects. Tr. (Ratner) June 30, pp. 51-52.[135] The Court agrees with Dr. Ratner that it was a breach of the standard of care for the VA to have prescribed such an increased dosage of Abilify, and to have done so without appropriate follow-up care. The Court also concludes that Dr. Manov's frequent increase in dosages of Perez's

---

[134]For example, Dr. Manov continued to prescribe multiple medications to Perez in February 2007, even though he observed that the medications were only having a "fair" level of beneficial impact.

[135]Dr. Manov initially doubled the dosage of Abilify (from 10 mg daily to 10 mg twice daily), and then increased the dosage to 30 mg twice daily - all in just six weeks. Dr. Ratner opined that the usual adjustment of Abilify is by only five mg per week, as there are potentially very serious side effects such as neurological problems, and a risk of toxicity. Tr. (Ratner) June 30, pp. 51-52.

95

prescribed medications without any documentation as to a need to do so, and only shortly after Perez had first been prescribed the medications, deviated from the standard of care of a reasonably prudent psychiatrist.

Dr. Manov's decisions as to the quantity of medication to be prescribed appeared to have been made with little analysis; nor did Dr. Manov appear to have been paying attention, generally, to the prescriptions he was issuing to Perez.  For example, Dr. Manov testified that it was his intention to switch Perez from Seroquel to Abilify, Tr. (Manov), June 28, pp. 177-178, June 29, p. 47, but Perez continued to be prescribed both medications.[136]  Perez actually never refilled Abilify after he saw Dr. Manov on May 12, 2006, Plaintiff's Ex. 66: USA-45, and instead received several additional refills of Seroquel, including his last (fifth) refill on January 16, 2007 (and the prescription finally expired on April 14, 2007).  Plaintiff's Ex. 66.  As another example of Dr. Manov's failure to pay attention, the Court notes that when Dr. Manov saw Perez at the Clinic on April 3, 2008, he incorrectly noted that Perez had current prescriptions for Wellbutrin XL (but it had expired in February 2008) and Clonazepam (it had expired in August 2007).[137]  In fact, Perez did not have active prescriptions or any refills available for: Seroquel, Abilify, Wellbutrin XL, Olanzapine, Clonazepam, nor Temazepam, and he had only one

---

[136]Dr. Manov later modified his testimony and said that he intended to switch Perez from Seroquel to Risperidone.  Tr. (Manov) June 29, p. 47.

[137]Nurse Heitman noted that Perez was going on a "drug holiday" and would not be taking his medications for a week - apparently she also thought that Perez had multiple psychotropic medications available to refill.

month's refill of Risperidone tablets available.[138]  Perez left the Clinic in April

without having received even the one psychotropic medication still available to

him.[139]

 While the Court does not impose a duty on a mental health care provider to

personally guarantee that a patient is taking each prescribed medication, the Court

does find it to be reasonable to require a prescribing physician to - at a minimum -

engage in a meaningful review of the patient's medication history and current

status, and to renew expiring medications as appropriate.  At the VA, and probably

at many large health care provider systems, this meaningful review is particularly

easily accomplished by a review of the patient's computerized medical records.

 As the VA's psychiatrist assigned to treat Perez, Dr. Manov was the only

person with the authority to change or adjust Perez's psychotropic medications

while he was receiving outpatient care, Dr. Manov fell below the standard of care by

---

[138]Dr. Hughes also attempted to excuse the VA's poor management of Perez's prescribed medications by referencing a recent unidentified study reporting that three quarters of people who are prescribed medications do not take them as the doctor prescribes, and a third of such people do not even get their prescriptions filled.  Tr. (Hughes) July 11, p. 19.  Dr. Hughes appeared to be speculating that even if the VA had properly monitored Perez's medications, Perez would not have taken the medicine.  His opinion is rejected, as Florida courts caution that an expert may not rely on pure speculation.  Cox v. St. Josephs, 71 So. 3d 795, 801 (Fla. 2011).

[139]Nurse Heitman's record of April 10 shows that while Perez was relatively current on some of his other medications (e.g., Albuterol inhaler), he had not obtained refills of Olanzapine nor Risperidone since August 2007, MR 324, nor Wellbutrin XL since January.  According to the VA's Medication Profile only two psychotropic medications were actively prescribed to Perez as of April 2008, Risperidone and Olanzapine, and only Risperidone had a refill remaining (a single refill).

failing to keep track of what medications were prescribed to Perez and the status of his refills – a task which witnesses in this case testified is easy to perform by using the VA's computer system. This easily performed task would have revealed that the medications prescribed to Perez were not uniformly refilled throughout 2006 and 2007 and, in April 2008, the majority of those medications had expired; in short, there was not any prescription that would have lasted the six months that Dr. Manov told Perez to wait for his next appointment.

Not only was Dr. Manov mistaken in his assumption as to what medications were available to Perez in April 2008 (a mistake which easily would have been corrected if Dr. Manov had looked at the VA's records, Tr. (Manov) June 28, pp. 178-179), but he also was unaware of relevant information about Perez that was available in the VA's record. For example, Perez had been determined to be depressed in late August and in October 2007, and had not been receiving regular dosages of an antidepressant for the several months prior to his visit to the Clinic in April. This information might have caused Dr. Manov to doubt whether Perez could reliably answer important questions as to whether he had a suicidal intent; in any event, Dr. Manov should not have relied solely on Perez's denial of a suicidal intent.[140]

The record suggests that there was, at best, poor communication between

---

[140]On several occasions during his psychiatric hospitalizations, Perez had denied a suicidal or homicidal intent, but the VA hospital-based physicians maintained Perez under close supervision, with a 1:1 sitter, due to their own assessment that he was at risk.

Perez and Dr. Manov, such that Dr. Manov failed to properly assess Perez's

psychiatric needs or provide appropriate treatment and care.  For example, Dr.

Manov testified that he was not aware, in April 2008, that Perez had been

discharged from the MHICM program seven months earlier.  Tr. (Manov) June 28,

p. 162, Tr. (Manov) June 29, p. 52.  At trial, Dr. Manov appeared to be proud of his

perceived insight and understanding of Perez in spite of their infrequent contact.

Dr. Manov testified that he was Perez's "friend, his psychiatrist" and that he "knew"

this patient, Tr. (Manov) June 28, p. 182, Tr. (Manov) June 29, p. 86, but he also

admitted that "I don't know.... I don't follow him.  I don't know what he is doing."

Tr. (Manov) June 28, p. 175.[141]

When Dr. Manov first met Perez in February 2006, Dr. Manov apparently

determined that he would rely, in part, on the fact that Sandra Perez (who was still

living with Perez at the time) would bring Perez to the VA if his condition

deteriorated.  Tr. (Manov) June 29, p. 72.  In light of this fact, Dr. Manov's recorded

observation that Perez was living in an apartment by himself in April 2008 should

have been of some concern.  MR 327.  Perez may not have been inclined, on his own,

---

[141]On several occasions Dr. Manov was somewhat unprofessional on the
witness stand at trial, e.g., accusing the Plaintiff of bringing this action because she
needed money "from American taxpayers to pay tuition for Georgetown University."
Tr. (Manov) June 29, p. 125.  To the extent that such uncontrolled outbursts
revealed themselves in the courtroom, there is some concern that Dr. Manov also
may have been flippant during his private meetings with patients - which is, of
course, unknown.  In any event, the Court has significant doubts that a therapeutic
benefit could have been achieved for Perez as a result of his brief and infrequent
meetings with Dr. Manov.

to disclose that he needed psychiatric help; Dr. Manov - who professed to "know" his patient - should have taken this into account and developed a method of inquiry which would not trigger Perez's delusions.

Dr. Manov testified that throughout his treatment of Perez, Dr. Manov did not want Perez to feel that his actions were being monitored, Tr. (Manov) June 29, p. 59, but Dr. Manov was the person at the VA most responsible for monitoring Perez's compliance with his medications and his psychiatric care; if Dr. Manov was not conducting meaningful monitoring, it is clear that no one else at the VA was doing so. Nurse Heitman and Mr. Scheer both were relying on Dr. Manov to serve as the treating psychiatrist. Dr. Manov, in turn, claims that he was relying on Perez - a delusional patient with a schizoaffective disorder - to tell him what care he needed; this is unacceptable conduct and does not meet the standard of a reasonably prudent psychiatrist.

At trial, Dr. Manov attempted to justify the infrequency and brevity of his interactions with, and monitoring of, Perez as appropriate care for a patient with paranoid delusions. For example, Dr. Manov claimed that he had no idea whether Perez received his medications on April 3, as that "was my way of avoiding interference with his paranoid system." Tr. (Manov) June 29, p. 56. Dr. Manov professed that his biggest concern in treating Perez was to avoid being included in Perez's perception of the gang that was pursuing him. Tr. (Manov) June 29, p. 59.[142]

---

[142]Despite Dr. Manov's stated concern that he not interfere with Perez's paranoid system, when Dr. Manov first met Perez, just a few days after Perez's

Dr. Manov testified that he was "walking on egg shells" around Perez and did not even ask Perez if he wanted a long-acting injection of an antipsychotic medication because "paranoid people don't like shots." Tr. (Manov) June 29, p. 54. The record contradicts this opinion, as Mr. Scheer testified that Perez had requested the long-acting injection and was willing to receive it in February 2007.

While Dr. Hughes agreed with Dr. Manov's approach to Perez, and testified that a therapeutic relationship had been established between the two men, Dr. Hughes offered no evidence as to how such infrequent appointments and nearly non-existent monitoring of Perez's medications would have been beneficial to Perez. Expert testimony is properly excluded "when the only connection between the conclusion and the existing data is the expert's own assertions." McDowell v. Brown, 392 F. 3d 1283, 1301-02 (11th Cir. 2004). While it may be true that a therapeutic relationship can be formed with the minimal contact Dr. Manov had with Perez, unfortunately the record does not reveal that Dr. Manov's approach achieved a therapeutic benefit for Perez.

Indeed, Dr. Manov's conduct may have communicated to Perez that it was not important for Perez to be seen for psychiatric care regularly. Perez suffered from a severe mental illness, and lacked good judgment and proper insight. He was

---

discharge from inpatient psychiatric care, Dr. Manov recommended that Perez view a movie, "Conspiracy Theory," which was credibly described by Dr. Ratner as very violent and inappropriate and destructive for someone who was diagnosed as psychotic. Tr. (Ratner) June 29, pp. 150-151. Even Defendant's own expert witness acknowledged that the suggested film "may or may not have been the best example" to recommend to a delusional patient. Tr. (Hughes) July 11, pp. 29, 80.

told that he needed to take his medications, but then none were prescribed to him in late 2007 through his death in 2008, even after he requested renewals. It is within reason to conclude that Perez was confused by the VA's conduct and, because the VA failed to take several reasonable steps to provide care to Perez, e.g., scheduling appointments regularly, more closely monitoring Perez's prescription status, contacting the family to gather additional information, etc., he ultimately was left without treatment for his documented severe mental illness. Although Dr. Manov had prescribed multiple psychotropic medications to Perez at his last appointment, in February 2007, Dr. Manov failed to prescribe a course of treatment for Perez in April 2008 that included any medications - despite the evidence that when Perez was, at least, mildly compliant with his prescribed medications, Perez's mood stabilized.

The Court finds that Dr. Manov's conduct fell below the standard of care when he determined that a six-month follow-up appointment was sufficient after seeing Perez on April 3, 2008, and also when Dr. Manov issued no new or renewed prescriptions on that date to manage Perez's delusions. Dr. Manov testified that there was no basis to adjust Perez's medications when he saw him for the last time in April 2008, nor was there any reason to offer him a long-acting injection of an antipsychotic medication, Tr. (Manov) June 29, pp. 122-123, and that, as a result of Dr. Manov escorting Perez to the pharmacy on April 3, Perez "was very pleased with this arrangement [and he] started taking his medication [and] got much better." Tr. (Manov) June 29, p. 55. This statement obviously was inaccurate in all

respects.

A psychiatric care provider cannot absolve themselves of their duty to render proper treatment and care to a patient by pointing to the patient's paranoia as justification for a "hands off" approach to treatment. Appropriate psychiatric care requires the psychiatrist to apply his or her specialized knowledge to the benefit of an individual.[143] The Court finds that Dr. Manov's distance from Perez - as evidenced in the infrequency of appointments, the brief nature of the limited personal interactions, and his inaccurate perceptions of Perez's mental status - resulted in treatment below the standard of care. Dr. Manov's infrequent, brief and rushed interactions with Perez stand in direct contrast to the level of interaction fostered between Perez and the MHICM staff while Perez was in the MHICM program.

The Court observes that Perez was at least partially compliant with his prescribed medications while he was in the MHICM program, perhaps due, in part, to the MHICM program's comprehensive approach to outpatient care, including home visits, assistance with transportation to appointments, etc., and it appeared that the medications were having a positive effect. Mr. Scheer noted that Perez was better at the time of discharge from the program, Tr. (Scheer), June 28, pp. 66-67, and had successfully met the objective of having six months without a psychiatric

---

[143]See, e.g., Silva, 601 So. 2d at 1187 (citing a medical dictionary defining "care" as "the application of knowledge to the benefit of ... [an] individual.").

hospitalization after starting in the MHICM program in January.[144] It is unclear whether the perceived positive effect was as a result of the therapeutic effect of the personal visits which distinguish the MHICM program, including visits while he was hospitalized in January and July -August 2007, or was the result of Perez having received some of his psychotropic medications and, presumably, following the recommended dosages during that time (during his hospitalization, his medications were administered by VA hospital staff).

The Court finds that the MHICM program overall was a positive influence on Perez's mental health. As the MHICM program is unique to the VA, there is little guidance as to what would be the appropriate standard of care against which to evaluate the program. The Court has determined that there is not sufficient evidence that any activities related to the MHICM program constituted a breach of the VA's duty. While there is a question as to what should have happened at the time of Perez's discharge from the MHICM program, the Court has considered that question in the context of the overall breach of the VA with respect to regular monitoring of Perez's mental health.

The VA provided psychiatric care to Perez in such a haphazard and inconsistent manner that Perez may have perceived that he either didn't need any psychotropic medications or that they were not likely to have much effect, or -

---

[144]Perez's need for at least a week of psychiatric care during his July - August 2007 hospitalization for lung surgery apparently was not of concern to the MHICM administrators.

perhaps - that he did not suffer from a serious mental illness. The VA documented in April 2008 that Perez had decided not to take his psychotropic medications in light of his delusions, including his fear that the medications had been tampered with by the cult pursuing him. While Dr. Manov recorded that there was no need to prescribe medications to Perez in April 2008, because he thought that Perez would not take them even if prescribed, Dr. Manov failed to develop or implement an alternative approach to treatment. The VA documented as late as April 10, 2008, that Perez continued to experience persecutory delusions but failed to recommend any course of treatment for his severe mental illness. Even if Perez had received his one last month's worth of psychotropic medications on April 3, there was no other treatment or care being implemented by the VA after that date, nor did the VA even have a treatment plan in place - instead, the VA expected that Perez would return in six months for an appointment to see Dr. Manov. The greater weight of the evidence demonstrates that the VA had no treatment plan for Perez as of April 3, 2008, and, as such, failed to meet its duty to Perez.

### d. Did the VA fail to treat or care for Perez in April 2008?

When Perez visited the Clinic on April 3, 2008, VA staff recorded that Perez needed an immediate mental health consultation, and that he had stopped taking his psychotropic medications.[145] As was obvious, or should have been obvious,

---

[145]Again, the Court observes that Perez had only one active prescription, for one month's supply of Risperidone tablets.

Perez's psychosis had worsened without his medications.  Tr. (Ratner) June 30, pp. 69-70.  Although he reportedly was calmer before he left the Clinic that day, Dr. Ratner testified that Perez's condition on April 3, particularly his sudden change in mood (from very agitated to "calm, cool, and collected"), would be a strong indicator of danger and a cause for a psychiatrist to be "very, very concerned" and suspect of the information gained from the patient at that time.  Tr. (Ratner) June 30, pp. 134-135.[146]  Dr. Hughes admitted that it is "spooky" when someone has been behaving in a grossly inappropriate manner and then suddenly becomes calm, but he attributed Perez's calmer behavior simply as a sign that Dr. Manov had been successful in calming Perez.  Tr. (Hughes) July 8, pp. 71-72.

Dr. Ratner also testified that despite Nurse Heitman's documentation of Perez's recent alcohol abuse when he arrived at the Clinic on April 10, she did not administer a competency exam or conduct a suicide screening.  Tr. (Ratner) June 30, pp. 76-77.  Dr. Ratner testified that it was a breach of care for the VA to fail to conduct a suicide screening on April 10 in light of Perez's admitted alcohol

---

[146]For example, a "flight to health" phenomenon is described briefly in Reid v. Altieri 950 So. 2d 518 (2007).  In that case, a patient had a suicidal intent one moment and then a miraculous recovery overnight; it was suggested that sudden changes in behavior might have warned the psychiatrist of danger.  The patient had periods of depression and had been hospitalized for suicidal ideation, and committed suicide the morning after he was seen at the hospital and released.  Both the hospital (although it had reached a settlement pre-trial) and the psychiatrist were found to be responsible.  The patient and the patient's wife had agreed to a "contract for safety" in which they promised to seek hospital care if the patient's suicidal thoughts returned.  "The contract for safety indicates the doctor knows there is some risk in releasing the patient and is assuming some increased responsibility towards the patient."  950 So. 2d at. 521.

consumption and his still being psychotic, and the fact that Perez had left the Clinic the prior week (and was leaving on that day) without any psychotropic medications. Tr. (Ratner) June 30, pp. 72-73, 78-80. Dr. Ratner testified that these actions and inactions are evidence of a breach of the standard of care. Tr. (Ratner) June 30, p. 80. The Court agrees.[147]

Dr. Ratner testified that involuntary admission was warranted on both April 3, and April 10. Tr. (Ratner) June 30, pp. 80-81. Dr. Hughes disagreed but offered little relevant analysis to support his view that it was appropriate to permit Plaintiff to leave the VA without being further evaluated. Tr. (Hughes) July 8, pp. 139-141. When Dr. Manov saw Perez on April 3, Dr. Manov failed to take into consideration - nor was he even aware - that Perez had twice failed a screening for depression in the past eight months and was not receiving an antidepressant medication at the time. It was a deviation from the standard of care for Dr. Manov to have not noted the several risks for suicide presented by Perez on April 3, 2008. The Court finds that the VA, at minimum, should have conducted a thorough competency examination on April 3, including an evaluation of Perez's history, and

---

[147]Although Nurse Heitman had been trained to recognize if someone was suicidal, Tr. (Heitman), July 7, p. 9, and she never deemed Perez to be suicidal, the record does not support her determination that Perez was at no risk of suicide when he was at the Clinic on April 10.

Dr. Hughes testified that Heitman provided comprehensive care, and that her overall level of general medical care provided to Perez was "darn good." Tr. (Hughes) July 8, p. 63. He suggested that she also provided a type of supportive psychotherapy by providing active support to help Perez through crises, Tr. (Hughes) July 8, pp. 63-65; however, this is insufficient to satisfy the VA's duty to provide adequate psychiatric care.

also should have referred Perez for further evaluation on April 10, and scheduled appointments for psychiatric care in the near future, and that the failure to do so was a breach of the standard of care.

In summary, the Court finds that it was a breach of the VA's duty of care to Perez that for months at a time, no psychiatrist from the VA was monitoring, evaluating, or adjusting Perez's medications, and that even on the few occasions when Perez was seen by Dr. Manov, the quality of the care was poor, as evidenced by the failure to document a need for increasing dosages of newly prescribed medications; the failure to achieve the switch Dr. Manov described, from Seroquel to Abilify (or to Risperidone), in a timely manner; and the failure to prescribe any medications to address Perez's mental illness in April 2008.

Perez's status as an outpatient at the time of his suicide does not negate the duty imposed on the VA to provide appropriate psychiatric treatment and care. Specifically, the prevailing standard of care required the VA to take reasonable steps to provide treatment and care to Perez, such as scheduling appointments regularly, coordinating care (e.g., recognizing that Perez was no longer in the MHICM program), confirming that prescribed medications were being obtained, promptly issuing refills and renewals as necessary, offering longer-lasting medications when appropriate, and not waiting for extended periods of time before scheduling a follow-up appointment after prescribing significantly different medications. Finally, the VA had a duty - at a minimum - to schedule Perez for additional care soon after Perez's disturbing visit to the Clinic on April 3, 2008, and

108

the VA's decision that Perez did not need to be seen for six months after that date was a breach of that duty; the VA also had a duty to conduct a psychiatric evaluation of Perez on April 10, 2008, and the decision to send him home without such care was a breach of that duty.  In failing to comply with these standard aspects of appropriate treatment and care, the VA breached its duty to Perez and, therefore, his mental illness was being only irregularly, if at all, treated by the VA.

### ii. The VA's breach of duty as to treatment and care proximately caused Perez's suicide

The Court must determine whether the VA's conduct foreseeably caused Perez's suicide.  As exhaustively detailed above, the VA, the sole provider of psychiatric care for Perez's final two years, had specific knowledge of his psychiatric record, including his prior explicit suicidal ideation expressed during inpatient treatment fifteen months before his death and his lack of compliance with prescribed psychotropic medications as recently as the week prior to his death; despite this knowledge, the VA failed to take reasonable steps to try to prevent Perez's suicide.  According to Dr. Ratner, there was a correlation between when Perez was filling his prescriptions (and, it seems, taking the medications) more regularly, either while in the hospital or while being seen by in the MHICM program, and Perez's better state of mental health.  Tr. (Ratner), June 30, p. 68.  Unfortunately, the VA did not continue Perez in the MHICM program after the end of August 2007, nor did the VA take reasonable steps to attempt to prevent Perez's

suicide by, for example, providing ongoing psychiatric care or treatment.

The greater weight of the evidence established that the VA deviated from accepted psychiatric standards in its failure to monitor Perez more regularly, to schedule timely appointments and follow up on any missed appointments, and to manage his medications more closely. The lack of adequate monitoring rendered the therapeutic relationship non-existent such that Perez was left to deteriorate on his own.[148] Dr. Ratner testified that the breaches in the standard of care, described above, collectively had a "more likely than not" causal aspect to Perez's death by suicide. Tr. (Ratner) June 30, p. 81. The identified breaches of duty ultimately alienated Perez from psychiatric care he needed desperately[149] and caused him to deteriorate, unavoidably, to the point of suicide.

Dr. Ratner testified that, "if one looks at a pattern over time, and they see that somebody is not getting certain kinds of treatment on a regular basis, and we know that they have a progressively degenerative cerebral disease, and it is not being addressed on a regular basis, then we can say that that deviation of standard

---

[148]Defendant's own expert admitted that on April 3, 2008, "[t]here was an indication that [Perez] needed more support, that he needed to start seeing Brenda Heitman to start taking his HIV medication," Tr. (Hughes) July 8, p. 140, but Perez was given instructions to return for psychiatric care six months later.

[149]For example, Perez reportedly explained his failure to regularly take his medications as the result of his own doubts regarding their efficacy. Stip. ¶ 55, MR 1024. The Court observes that if Perez had been receiving regular and adequate therapeutic care he might have understood that the medications could be effective - as they had been at least moderately effective during Perez's several hospitalizations and during some of the period while he was receiving care in the MHICM program - and, therefore, he might have been more compliant.

110

of care, not that one episode, but the combination of those things contributed to the final result." Tr. (Ratner) June 30, p. 113. Dr. Ratner testified that, within a reasonable degree of medical certainty, "had [Perez] been treated [more adequately] ... he would have at least been continued on the medication, which may have prevented him from getting to the desperate state that he got." Tr. (Ratner) June 30, p. 105. Adopting the opinion of Dr. Ratner as reliable, the Court finds that the VA's deviations from accepted psychiatric standards as to the treatment and care of Perez proximately caused his death. Tr. (Ratner) June 30, pp. 81, 136.

## 2. Rejection of other theories of liability

The United States asserted, in its Affirmative Defenses, that any judgment of liability must take into account the negligence of Perez himself. The Court finds that the Defendant did not establish that Perez had a duty to protect himself from the negligent treatment described above. There is no evidence that Perez was warned by Dr. Manov, or any other VA employee, that the failure to take his psychotropic medications as prescribed or the failure to participate in a therapeutic treatment plan would result in a situation where Perez would be a danger to himself. The record in this case reveals that the VA communicated to Perez that it was acceptable to wait six months to be seen for psychiatric care, and also that the medications apparently were not that helpful or necessary.[150]

---

[150]When he saw Perez on April 3, 2008, Dr. Manov noted that he did not expect Perez to take his medications, and Dr. Manov did not renew any of the

The Court also wholly rejects the United States' attempt to blame Plaintiff for her father's suicide.[151]  The allegedly upsetting phone call between Perez and his daughter several days prior to his suicide was not demonstrated to have proximately caused the suicide.  Perez spoke to his former wife about the call with their daughter and did not express that he was suicidal as a result thereof.  Moreover, although the Defendant attempted to cast the daughter's exasperated message to her father during that fateful call as a declaration that she would not speak to him until "after" the summer, instead of "until" the summer, there is no evidence that the trip planned for Perez and his daughter the following month had been cancelled;[152] therefore, the evidence indicates that Perez would have realized that he would be traveling with his daughter the following month.[153]

_____

prescribed psychotropic medications.  Although Dr. Manov reportedly escorted Perez to the pharmacy, he left Perez there on his own instead of verifying that Perez received his (only) prescription.  It is not unreasonable to consider that Perez understood from this interaction with Dr. Manov that Perez need not follow through with the prescribed treatment.

[151]Indeed, the Court must comment on the attempt by the United States to cast the Plaintiff as not "exactly the sweet little gal all the time that you saw in this courtroom." Tr. (Defendant's closing argument) July 13, p. 48. That comment was an unnecessary and inappropriately over-zealous statement by counsel for the United States.

[152]Defendant's expert, Dr. Hughes, noted that despite the statements Plaintiff made in her last phone call with her father, Plaintiff continued to plan to go to Ecuador with him the following month. Tr. (Hughes) July 11, p. 14.

[153]The Court agrees with Plaintiff's counsel that it is unusual that the Defendant would argue that Perez's mental state was so fragile that being told by his daughter that she needed a temporary (i.e., approximately one month) break in communication would lead him to take his life several days later, but that such a fragile mental state did not require the VA to do more than leave Perez alone for

The Court specifically finds no comparative fault attributable to either Plaintiff or Sandra Perez. The family members, reasonably relying on the allegedly expert care being provided to Perez by the VA, had no duty to tell the VA of the old pistol in Perez's home; similarly, they were not required to report the existence of scissors, knives, glass, household chemicals, or anything else that might have been used by an individual faced with an uncontrollable urge to commit suicide. Even if the family had a duty to notify the VA of the presence of the pistol (or any other potential weapon) in Perez's apartment, it was not demonstrated that the failure to notify the VA proximately caused the suicide.

### 3. Damages

Having determined that the United States is liable for the death of Perez, the Court also makes the following findings as to damages. The damages provisions of Florida's Wrongful Death Act, Fla. Stat. § 768.16 *et seq.*, govern this determination. According to that statute, recoverable damages include lost parental companionship, instruction, and guidance, as well as mental pain and suffering due

---

months at a time without monitoring his multiple psychotropic medications or ensuring that he receive therapeutic psychiatric care. The Defendant's position appears to be that the VA had no responsibility on either April 3 or April 10 to even verify whether Perez was receiving his psychotropic medications, nor was there any need to schedule an appointment to see him any sooner than six months in the future, despite his continuing belief that a cult was after him, because Perez had not specifically stated an intent to take his own life when he was asked that question by VA staff. The Court rejects the Defendant's attempt to impose such a low standard of care on the conduct of psychiatric care providers.

to the loss of a parent.  Fla. Stat. § 768.21(3).   Funeral expenses also may be awarded.  Fla. Stat. § 768.21(5).

## Economic Damages

Plaintiff offered evidence - uncontroverted - that the funeral expenses related to her father's death totaled $3,380.00.  Plaintiff's Ex. 49.  Plaintiff also seeks reimbursement of $1,369.50 - the cost of the cleaning services required at her father's apartment after the discovery of his deceased body.  Plaintiff's Ex. 50.  In addition, Plaintiff requests reimbursement of $951.70 for the cost of her family's trip to Ecuador to honor her father's wish that his ashes be spread at Quito. Plaintiff's Ex. 54, Tr. (Maria Jose Perez) June 27, p. 66-67.  As this evidence was unchallenged by the Defendant, and appears to fall within the statutory guidelines as "funeral expenses," the Court has determined that Plaintiff's total award for economic damages resulting from her father's wrongful death is **$5,701.20.**[154]

## Noneconomic Damages

Plaintiff seeks $1,500,000 in noneconomic damages under Fla. Stat. § 768.21(3).[155]  As an initial matter, the Court must assess the life expectancy of the

---

[154]Defendant did not dispute the evidence offered to substantiate the claim for "funeral and burial expenses," nor did Defendant, in its post-trial Proposed Findings of Fact and Conclusions of Law, address the specific amount of Plaintiff's request for damages.

[155]As the Court has not found a basis for an award that would trigger the limitations on recovery set forth in Fla. Stat. § 766.118, there is no need to reach

decedent.  The expert witnesses testifying as to Perez's life expectancy disagreed as to two primary aspects of Perez's medical status: his diagnoses of lung cancer and his HIV-positive status.  The parties' experts had substantial experience in evaluating patients in the fields of oncology, hematology, pathology, and internal medicine.  Tr. (Villa) June 30, pp. 3-5, Tr. (Lessin) July 1, pp. 43-44.  Additionally, both experts reviewed the medical records of Francisco Perez that were maintained by the VA and Memorial Hospital, as well as Perez's autopsy report.  Tr. (Villa) June 30, p. 6, Tr. (Lessin) July 1, p. 52.[156]

### Effect of lung cancer diagnosis on life expectancy

Perez was fifty-six years old at the time of his death.  Perez had been diagnosed in 2005 with Non Small Cell Lung Carcinoma (NSCLC) in Stage 1a, No, MO.  Both experts agreed that Perez's tumor was small, and that the cancer diagnosis was made in the earliest stage possible for NSCLC - in essence, this diagnosis has the highest survivability and cure rate of all lung cancer diagnoses. Tr. (Lessin) July 1, pp. 80, 91-92.  Plaintiff's expert witness, Dr. Luis Villa, noted that no chemotherapy had been recommended for Perez after his lung surgery in July 2007 (which removed the tumor and the lower right lobe of the lung) and subsequent studies revealed no evidence of recurrent disease.  Tr. (Villa) June 30,

---

that issue.

[156]The accuracy of the autopsy report is questionable, based on the fact that it indicates the presence of a right lung, even though Perez had the lower lobe of his right lung removed by the VA on July 9, 2007.  Tr. (Lessin) July 1, p. 52.

pp. 17-21.  According to Dr. Villa, Perez did not have anything that would impact on the curability of his lung cancer. Tr. (Villa) June 30, p. 25.

In his testimony, Dr. Villa referred to a graph, described as a relative survival curve representing more than 4,000 patients with lung cancer. Tr. (Villa) June 30, p. 33.  Based on his interpretation of that data, Dr. Villa testified that he believed that Perez had a five year survivability rate of close to 100%, and a 60% chance of surviving ten years.  Tr. (Villa) June 30, pp. 26, 36.  Defendant's expert witness, Dr. Lessin, disagreed with the testimony of Dr. Villa, noting that Perez would have a lower life expectancy than indicated in the graph because Perez's other medical issues would continue to damage his organs and reduce his chances of surviving five years, but Dr. Lessin was unable to confirm whether the data represented in the graph already had accounted for persons who continued to smoke, had COPD, etc. (as Perez did).  Tr. (Lessin) July 1, pp. 66-68, 70.  (Dr. Villa noted that the data already accounted for smokers, so there was no need to reduce the survivability rates beyond what the report indicated.)  Dr. Lessin offered his opinion that Perez had only a 50% chance of surviving to five years, and that Perez had a zero percent chance of surviving to ten years, relying on the Charlson Comorbidity Index.  Tr. (Lessin) July 1, pp. 57, 65, 67, 72, 116.

### Effect of HIV-positive diagnosis on life expectancy

Dr. Villa, a pathologist, testified that he did not believe that Perez had AIDS, because Perez was not immunosuppressed enough to make that diagnosis, but

rather that Perez was only HIV infected. Tr. (Villa) June 30, p. 28. Dr. Villa observed that patients like Perez, who never suffered an opportunistic infection in almost 20 years after diagnosis with HIV, survive longer and, as such, the HIV would have only a modest impact on his survival. Tr. (Villa) June 30, pp. 22-23, 25. Dr. Villa testified that Perez's CD-4 count,[157] which ranged from 150-200, suggested that Perez was inconsistent with his HIV medications - which accounts for the fluctuation in the measurement, but that he was unlikely to have complications because he had not had a significant infection while HIV positive. Tr. (Villa) June 30, pp. 27-28. Dr. Villa noted that whatever Perez was doing with his medications was effective in managing his HIV. Tr. (Villa) June 30, p. 43.

Dr. Lessin testified that the Centers for Disease Control defines a cell count of less than 200 as AIDS and that based on that definition, Perez had AIDS. Tr. (Lessin) July 1, p. 46. Disagreeing with Dr. Villa, Dr. Lessin further testified that Perez's CD-4 count often put him into a significantly immunosuppressed situation. Tr. (Lessin) July 1, pp. 46-47. Nurse Heitman testified that Perez had oral candidiasis on one occasion, January 25, 2007, an opportunistic infection which could be associated with HIV, although she did not recall seeing it and may have been simply noting that Perez had told her he had it, as the medical record of that

---

[157]The CD-4 count refers to the number of a type of T-cells working against the HIV virus as it multiplies in the blood. As the virus multiplies, the T-cells respond and their numbers decrease, unless a patient is taking appropriate medications. Tr. (Villa) June 30, p. 26; Tr. (Lessin) July 1, pp. 49-50; Tr. (Heitman) July 7, pp. 77-78.

date says "no opportunistic infections." MR 919, Tr. (Heitman) July 7, pp. 55-56, 79-80, 113-114. The medical records from 2005 through 2008 reveal no other incidents of such an infection, Tr. (Heitman) July 7, p. 56, and a "Health Summary" dated July 9, 2007, prepared by the VA, noted that Perez "had a history of HIV positivity dating back to the 1980's with excellent response to treatment." MR 313.

### Other medical conditions and their effect on life expectancy

Both experts remarked that Perez had COPD, although Dr. Villa testified that Perez had mild COPD, and that it was highly unlikely Perez was going to die within five years from it. Tr. (Villa) June 30, p. 37; Tr. (Lessin) July 1, p. 55. Dr. Lessin remarked that Perez had emphysema, but Dr. Villa opined that Perez had been found to have adequate cardiac and pulmonary clearance for lung surgery the year before his death and, indeed, had survived a large loss of blood resulting from that surgery. Tr. (Villa) June 30, pp. 20-21.

Dr. Villa noted that the autopsy was silent as to a myocardial infarction and that indicated that Perez did not have coronary artery disease. Tr. (Villa) June 30, p. 19. Dr. Lessin testified that there was evidence in the VA records of a myocardial infarction, atherosclerosis, and coronary artery disease. Tr. (Lessin) July 1, p. 47. Dr. Lessin also testified that Perez had some brain abnormalities. Tr. (Lessin) July 1, pp. 47-48. Finally, Dr. Villa noted that despite Perez's reported alcohol consumption, there was no evidence, either clinically or in the autopsy report, of cirrhosis. Tr. (Villa) June 30, p. 41.

The Court has weighed the evidence and considered the opinions of both

experts, and finds that Dr. Villa's opinions as to the life expectancy of Perez are entitled to greater weight as they are based on a more reliable assessment of the data in this case.  Based on the record before the Court, particularly Perez's prior diagnosis of lung cancer and his HIV-positive status, along with his other medical conditions, I find that it is highly likely that Perez would have survived at least five years beyond the date of his death, but unlikely that he would have survived ten years.

### Plaintiff's loss

Plaintiff, an only child, was raised by her father, who did not work outside the home.  Tr. (Maria Jose Perez) June 27, p. 42.  Plaintiff testified as to the many experiences and activities she and her father shared throughout her childhood.  Tr. (Maria Jose Perez) June 27, pp. 42-46.  Plaintiff was nineteen years old at the time of her father's death, and was attending her freshman year of college.  In the months prior to his death, Plaintiff received counseling related to her father's deteriorating mental health.  For example, the record of a counseling session in November 2007, reveals that she was concerned about the demands from her father and noted that her feelings alternated between pity and frustration that he would not make an effort to help himself.  Defendant's Ex. 1, GEO 123.  Plaintiff testified at trial that she did not attend her graduation from Georgetown University several years later because her father could not be there with her.  Tr. (Maria Jose Perez) June 27, pp. 69-70.

119

Plaintiff was a minor[158] at the time of her father's death, and the evidence demonstrated that she has suffered and will continue to suffer emotionally as a result of her loss.  In <u>Rivera v. United States</u>, 730 F. Supp. 1578, 1582 (S.D. Fla. 1990), an action brought under the Federal Tort Claims Act for wrongful death based on the  negligent treatment of a patient while he was at a VA hospital, the VA was held to be liable to a decedent's six year old son for $300,000 for pain and suffering and loss of companionship, instruction, and guidance.  Noting that the evidence suggested that the decedent would have lived another twenty years, the court observed that the child would "not have that parent in his life as he grows to adulthood, as the court must assume he would have had defendant not acted negligently." <u>Id.</u>  In <u>BellSouth Telecommunications, Inc. v. Meeks</u>, 863 So. 2d 287, 293 (Fla. 2003), the court held that "the damages recoverable by a minor child under section 768.21(3) . . . should be calculated based on the joint life expectancies of the minor child and the deceased parent."

The evidence in this case suggests that Perez would not have survived beyond another ten years.  Plaintiff's recovery must, therefore, be limited by the fact that her joint life experiences with her father were likely to continue only approximately another five years, until he reached 61 years of age, and were unlikely to continue until he would have reached the age of 66.  In light of the evidence presented by Plaintiff as to her damages, the Court awards $250,000 as

---

[158]Plaintiff was a minor according to Fla. Stat. § 768.18, which defines minor as "children under 25 years of age, notwithstanding the age of majority."

120

compensation for the loss of parental companionship and for her mental pain and suffering.

In summary, the Court finds that an award of $250,000 plus an additional $5,701.20 for economic damages is appropriate.

## CONCLUSION

Perez had a history of suicidal and homicidal ideation, including a previously expressed elaborately detailed suicide plan, and had been prescribed multiple medications - including for depression and psychosis; he also had been hospitalized for inpatient psychiatric care three times in the twenty-six months prior to his death by suicide. The VA had provided medical care to Perez for the past two decades, and was the exclusive source of psychiatric care during his final two years of his life, and should, therefore, have been aware of Perez's specific risk factors. Simply stated, Perez presented sufficient circumstances to have justified a more thorough review of his psychiatric history by his treating psychiatrist, Dr. Manov, and a more careful evaluation of his status by VA staff when he presented himself to the Clinic in April 2008. Throughout the treating relationship, the VA failed to develop and implement an appropriate treatment plan such that Perez's suicide might be avoided. A mountain's worth of mismanagement was present at the VA from the beginning of Perez's descent into his delusional system and continuing until the inevitable sad ending. Appointments were not scheduled regularly, nor sufficiently frequently, which left Perez alone and without the benefit of a

therapeutic relationship with anyone regarding his psychiatric care - all while his psychological status foreseeably deteriorated.

For the Court to find for the Defendant in this case would be to excuse the conduct of the VA and its staff as simply being honest errors of judgment made while providing care recognized as acceptable - but the facts before the Court do not support such a finding.  Dr. Manov and other employees of the VA[159] delivered care within the course and scope of their employment that fell short of the prevailing standard of care.  The fabric of psychiatric care provided to Perez by the VA was so loosely woven that it was foreseeable that Perez would slip through.

In conclusion, the Court finds that the VA's conduct was below the standard of care that governs the provision of psychiatric care to patients similar to Perez, and that this breach of duty more likely than not caused Perez's suicide.  In essence, Perez (and his family members) relied on the medical and psychiatric care being provided by Dr. Manov and the VA, including what should have been appropriate medication, to manage a clearly established serious mental illness; when that care fell below the prevailing standard in the community, Perez was unable to resist the impulses caused by his untreated disorder.  In other words, the VA's negligence proximately caused the mental deterioration of Perez to the point that he became unable to control his suicidal impulse or to realize the nature of his act and the risk

---

[159]While each VA employee who testified before the Court appeared to be well trained, intelligent, and compassionate, it is nevertheless the case that serious mistakes were made in the diagnosis, treatment, and care of Perez by the VA.

of self-harm.

As discussed above, the Court has concluded that Plaintiff is entitled to recover $255,701.20 in damages from Defendant as a result of the negligence of the VA and its employees.

DONE AND ORDERED in Chambers in Miami this 6th___ day of August 2012.


_____
WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT COURT JUDGE

copies to:    Herman J. Russomanno
              Karin D. Wherry, AUSA